No. 65,240

STEPHEN BAIR, *Plaintiff,* v. ROGER G. PECK, M.D.; PERRY SMITH, M.D.; GREAT BEND INTERNISTS, P.A.; and ALDERSON, SCHUCK-MAN, AND SMITH, P.A., *Defendants.*

(811 P.2d 1176)

Opinion filed May 24, 1991.

*Allen G. Glendenning*, of Turner and Boisseau, Chartered, of Great Bend, argued the cause, and *Lisa A. Beran*, of the same firm, was on the brief for plaintiff.

*John L. Carmichael*, of Woodard, Blaylock, Hernandez, Pilgreen & Roth, of Wichita, argued the cause and was on the brief for defendants.

The opinion of the court was delivered by

HOLMES, C.J.: This case originated as a medical malpractice action filed in the United States District Court for the District of Kansas. Judge Sam A. Crow, pursuant to the Uniform Certification of Questions of Law Act, K.S.A. 60-3201 *et seq.*, has certified to this court the question of the constitutionality of K.S.A. 1990 Supp. 40-3403(h). The specific question certified to this court reads:

"Does K.S.A. 40-3403(h) violate Sections 1, 5 and 18 of the Bill of Rights of the Kansas Constitution?"

The facts as submitted by the federal court are:

"This is a medical malpractice action against two treating physicians, defendants Roger Peck and Perry Smith, for negligence in the care and treatment of the plaintiff Stephen Bair during the period of November 25, 1985, through December 19, 1985. Plaintiff also seeks to recover damages from the defendants, Great Bend Internists, P.A. and Alderson, Schuckman and Smith, P.A. ('defendant associations'), on the basis of vicarious liability for the actions of the treating physicians. The parties tacitly agree that each of the defendants is a 'health care provider,' as that term is defined at K.S.A. 40-3401(f), who is 'qualified for coverage under the fund.' K.S.A. 40-3403(h).

"Defendant associations move for judgment on the pleadings. After noting that plaintiff did not allege any specific, independent act of negligence by them, the moving defendants argue that K.S.A. 40-3403(h) precludes them from being vicariously liable for the negligent acts of the treating physicians. Plaintiff attacks the constitutionality of this provision charging it violates sections 1, 5 and 18 of the Bill of Rights of the Kansas Constitution for the same reasons the Kansas Supreme Court has found other portions of the Health Care Act, K.S.A. 40-3401 et seq., unconstitutional."

As the individual defendants, Roger Peck, M.D., and Perry Smith, M.D., are not directly involved in the issues before this court, we will refer to the two "defendant associations" simply as the defendants.

K.S.A. 1990 Supp. 40-3403(h) as enacted in 1986 provides:

"(h) A health care provider who is qualified for coverage under the fund shall have no vicarious liability or responsibility for any injury or death arising out of the rendering of or the failure to render professional services inside or outside this state by any other health care provider who is also qualified for coverage under the fund. The provisions of this subsection shall apply to all claims filed on or after the effective date of this act."

This statute is a part of the Health Care Provider Insurance Availability Act (Act), K.S.A. 40-3401 et seq., which was originally enacted in 1976 to address the perceived medical malpractice crisis, including the problems of obtaining and maintaining affordable malpractice insurance and maintaining the availability of medical services in Kansas. State ex rel. Schneider v. Liggett, 223 Kan. 610, 611, 576 P.2d 221 (1978). The history and rationale for the adoption of the Act and other legislation intended to alleviate the "insurance crisis" and bring about "tort reform" have been discussed in numerous cases and need not be repeated at length herein. See Samsel v. Wheeler Transport Services, Inc., 246 Kan. 336, 789 P.2d 541 (1990); McGuire v. Sifers, 235 Kan.

368, 681 P.2d 1025 (1984); *State ex rel. Schneider v. Liggett*, 223 Kan. 610. Suffice it to say the Act has not had smooth sailing and has been reviewed, amended, and/or supplemented one or more times during nearly every session of the legislature since its original enactment.

The legislature has amended and/or supplemented the Act numerous times and has adopted considerable other legislation on the subject of "tort reform." However, at the time of the adoption of K.S.A. 1990 Supp. 40-3403(h) in 1986, the desired results have not been realized. Although medical malpractice insurance rates have declined in the last couple of years, the rates still remain high and in 1986 were continuing to rise. In response to the continued increase in the cost of obtaining medical malpractice insurance and after recommendations of the Special Committee on Medical Malpractice (See Proposal No. 47—Medical Malpractice, Report on Kansas Legislative Interim Studies to the 1986 Legislature 817 [December 1985]), the legislature enacted additional major tort reforms in 1986, including H.B. 2661. See L. 1986, ch. 229.

One of the 1986 reforms included in H.B. 2661 was K.S.A. 1990 Supp. 40-3403(h), which eliminated the vicarious liability of one health care provider for the acts of another provider when both are covered by the Health Care Stabilization Fund (Fund). The proposal to eliminate vicarious liability under the Act came from the Special Committee on Medical Malpractice. In its report to the legislature the committee stated:

"The Committee concludes there is a problem with rising medical malpractice insurance premium costs which, if not addressed, will affect health care delivery and availability in Kansas. The Committee does not believe Kansas licensees in medicine and surgery will be willing to continue business as usual in their practices if costs of professional liability insurance are not stabilized. The Committee believes that ample evidence has been presented to show that a problem of affordability now exists which requires legislative action." Report on Kansas Legislative Interim Studies to the 1986 Legislature, p. 858.

Before addressing the specific issues and arguments of the parties, we deem it appropriate to review certain principles and background pertaining to statutory construction and also the doctrine of vicarious liability.

In considering the constitutionality of statutes, we recently stated:

" 'This court is by the Constitution not made the critic of the legislature, but rather, the guardian of the Constitution.' *Tri-State Hotel Co. v. Londerholm*, 195 Kan. 748, 760, 408 P.2d 877 (1965). The constitutionality of a statute is presumed, and all doubts must be resolved in favor of its validity. Before a statute may be stricken down, it must clearly appear the statute violates the Constitution. Moreover, it is the court's duty to uphold the statute under attack, if possible, rather than defeat it, and if there is any reasonable way to construe the statute as constitutionally valid, that should be done. *Brown v. Wichita State University (Brown II)*, 219 Kan. 2, 9-10, 547 P.2d 1015 (1976) (citing *Moore v. Shanahan*, 207 Kan. 645, 651, 486 P.2d 506 [1971], and *Tri-State Hotel Co. v. Londerholm*, 195 Kan. 748)." *Kansas Malpractice Victims Coalition v. Bell*, 243 Kan. 333, 340, 757 P.2d 251 (1988).

In addressing the plaintiff's contention that K.S.A. 1990 Supp. 40-3403(h) violates various sections of the Bill of Rights of the Kansas Constitution, it must be recognized that the common-law doctrine of vicarious liability has long been a part of Kansas negligence law. The doctrine was succinctly explained in *Simpson v. Townsley*, 283 F.2d 743 (10th Cir. 1960), where the court stated:

"Under the law of Kansas, there is no distinction between the liability of a principal for the tortious acts of his agents and the liability of a master for the tortious acts of his servant. In both relationships, the liability is grounded upon the doctrine of respondeat superior. Under that doctrine, the liability of the master to a third person for injuries inflicted by a servant in the course of his employment is derivative and secondary and that of the servant is primary.

. . . .

"Moreover, under the law of Kansas, while a master whose liability is predicated solely on the doctrine of respondeat superior and not on any wrong on his part may be sued jointly with his servant for a tort committed by the latter within the scope of his employment, *they are not joint tortfeasors in the sense they are equal wrongdoers*. Where a master becomes liable to a third person for personal injuries caused solely by the act of his servant, under the doctrine of respondeat superior, and is required to respond to such third person in damages by reason of such liability, he will be subrogated to the rights of the injured third person and may recover over from his servant who is primarily liable." 283 F.2d at 746.

The modern theory underlying the common-law doctrine has been described by one authority as follows:

"What has emerged as the modern justification for vicarious liability is a rule of policy, a deliberate allocation of a risk. The losses caused by the torts of employees, which as a practical matter are sure to occur in the conduct of the employer's enterprise, are placed upon that enterprise itself, as a required cost of doing business. They are placed upon the employer because, having engaged in an enterprise, which will on the basis of all past experience involve harm to others through the torts of employees, and sought to profit by it, it is just that he, rather than the innocent injured plaintiff, should bear them; and because he is better able to absorb them, and to distribute them, through prices, rates or liability insurance, to the public, and so to shift them to society, to the community at large." Prosser and Keaton on Torts § 69, pp. 500-01 (5th ed. 1984).

As a practical matter vicarious liability was recognized as a method of providing a source of recovery for the innocent victim of another's negligence when the actual tortfeasor was unable to respond financially for the damage caused.

We now turn to the specific issues presented.

### Section 1 of the Bill of Rights of the Kansas Constitution

Section 1 of the Bill of Rights provides:

"**Equal Rights.** All men are possessed of equal and inalienable natural rights, among which are life, liberty, and the pursuit of happiness,"

and is commonly referred to as the equal protection clause.

Equal protection arguments under the Kansas Constitution and the United States Constitution are generally based upon allegations that a particular statutory classification denies to the person or parties falling within the classification some right which is not denied to others alleged to be similarly situated. Classifications which create specific burdened as well as benefited classes are not necessarily unconstitutional so long as certain safeguards are met and there is a necessity for the classification. See *Farley v. Engelken*, 241 Kan. 663, 668, 740 P.2d 1058 (1987).

In applying the equal protection clause of either constitution, this court must first determine the appropriate standard of review to be applied in analyzing the statute in question. Three standards of review in equal protection cases are generally recognized by the various courts and were recently defined in *Farley v. Engelken*, 241 Kan. 663, as follows:

"The 'rational basis' test for determining whether a statutory classification is constitutional requires consideration of whether the classification bears some reasonable relationship to a valid legislative objective." Syl. ¶ 3.

"The 'heightened scrutiny' test for determining whether a statutory classification is constitutional requires a determination of whether the classification substantially furthers a legitimate legislative purpose." Syl. ¶ 4.

"The 'strict scrutiny' test for determining whether a statutory classification is constitutional requires a determination of whether the classification is necessary to serve a compelling state interest." Syl. ¶ 5.

All parties agree that the strict scrutiny test is inappropriate in this case. Plaintiff contends, though, that this court should apply a heightened scrutiny test, sometimes referred to as the substantial relationship test, instead of the rational basis test urged by the defendants.

Numerous cases considering the impact of various statutes upon persons allegedly injured by medical malpractice have adopted the rational basis test as the appropriate one. *Leiker v. Gafford*, 245 Kan. 325, 363, 778 P.2d 823 (1989) (cap on nonpecuniary damages in wrongful death actions); *Farley v. Engelken*, 241 Kan. 663, (abrogation of common-law collateral source rule); *Stephens v. Snyder Clinic Ass'n*, 230 Kan. 115, 130, 631 P.2d 222 (1981) (shortened statute of limitations in medical malpractice cases). In *State ex rel. Schneider v. Liggett*, 223 Kan. 610, the court was faced with the first constitutional attack upon the Act. Dr. Liggett, a health care provider, contended the statutes mandating medical malpractice insurance were unconstitutional as a violation of the equal protection and due process clauses of both the federal and state constitutions. In reliance upon *McGowan v. Maryland*, 366 U.S. 420, 6 L. Ed. 2d 393, 81 S. Ct. 1101 (1961), this court stated, "Traditionally, the yardstick for measuring equal protection arguments has been the 'reasonable basis' test." 223 Kan. at 616. We conclude the rational basis or reasonable basis test is the appropriate test to be utilized in determining whether K.S.A. 1990 Supp. 40-3403(h) violates Section 1 of the Kansas Bill of Rights.

Having determined that the rational basis test is the appropriate one to be utilized in determining the equal protection arguments of the plaintiff, the issue is whether the elimination of vicarious liability for health care providers which denies to medical malpractice victims, but not other personal injury victims, a potential source for the recovery of damages is a classification that bears some reasonable relationship to a valid legislative objective.

Plaintiff contends that eliminating vicarious liability bears no reasonable or substantial relationship to the goals of the legislation, which are to ensure that the injured parties receive adequate compensation and to maintain quality health care in Kansas. Because the negligent tortfeasors would be the beneficiaries of reduced rates in those situations where the negligent health care provider owned an interest in the corporation, partnership, or association, quality health care would not be furthered by eliminating vicarious liability. Adequate compensation would not be available, because K.S.A. 1990 Supp. 40-3403(h) eliminates an additional source of recovery and the tortfeasor's insurance and the Fund's liability may not equal the jury's verdict. In the end, plaintiff contends that the burden of this legislation falls mostly on the seriously injured medical malpractice victim, and it is unjust to deny these victims the compensation that other personal injury victims receive.

Defendants, on the other hand, contend that the elimination of vicarious liability bears a reasonable relationship to the goals of assuring the availability of liability insurance, promoting quality health care, and preserving a litigant's right to reasonable compensation. The costs of insurance will be reduced and thus affordable malpractice insurance will be available because the overall risk will be reduced and because subrogation suits will be unnecessary once vicarious liability is eliminated. Quality health care and the litigant's right to recover compensation are still protected because the negligent health care provider is still fully responsible for the judgment while the employer health care provider remains subject to liability if the tortfeasor is not insured under the Act or if the employer is guilty of independent acts of negligence.

The Special Committee on Medical Malpractice concluded that, absent stabilization of malpractice insurance costs, Kansas physicians will not be willing to continue practicing in this state and that a failure to take legislative action in this area will affect health care delivery and availability in Kansas. The Committee's conclusions were essentially adopted by the legislature in H.B. 2661 (L. 1986, ch. 229, new § 1), currently codified at K.S.A. 1990 Supp. 60-3405. The statute provides:

"Substantial increases in costs of professional liability insurance for health care providers have created a crisis of availability and affordability. This situation poses a serious threat to the continued availability and quality of health care in Kansas. In the interest of the public health and welfare, new measures are required to assure that affordable professional liability insurance will be available to Kansas health care providers, to assure that injured parties receive adequate compensation for their injuries, and to maintain the quality of health care in Kansas."

Regarding vicarious liability, the Special Committee made the following conclusion and recommendation:

"The Committee notes that licensees in medicine and surgery are now required to pay medical malpractice premiums and surcharges as individuals and, additionally, must pay these costs for professional associations they may belong to (albeit at a reduced rate). The Committee believes this dual coverage requirement is not necessary to protect the public welfare and is aggravating a problem that already exists with high insurance costs." Report on Kansas Legislative Interim Studies to the 1986 Legislature, p. 859.

"[Recommendation] Other Insurance Changes. The bill requires partnerships of persons who are health care providers to obtain the mandatory insurance coverages so that vicarious liability of one health care provider for another may be abolished if both are covered by the Fund. Further, insurers may exclude from coverage liability for those health care providers already required to maintain professional liability insurance." p. 861.

The legislative history clearly supports defendants' contention that the limitation of vicarious liability bears a rational relationship to the State's objective of decreasing the costs of obtaining and maintaining malpractice insurance, an objective plaintiff ignores. If an insurer does not have to provide coverage for one claim from two policies or, stated otherwise, knows that claims under the employer health care provider's policy will be limited to the employer's acts of negligence, the insurer will be assuming less risk of loss and arguably the employer's malpractice insurance premium will be reduced or stabilized. Such a reduction or stabilization should make it easier for the individual health care provider to obtain malpractice insurance in excess of the Fund's liability and provide a greater incentive to do so.

In *Stephens v. Snyder Clinic Ass'n*, 230 Kan. 115, the court was faced with an amendment to K.S.A. 1975 Supp. 60-513, which reduced the statute of limitations for medical malpractice actions. In upholding the statute against an equal protection argument, the court noted:

"The public interest in solving the medical malpractice problem is discussed in depth in *State ex rel. Schneider v. Liggett*, 223 Kan. 610. That discussion shows clearly that there is a reasonable basis for dealing with malpractice actions against health care providers in a different manner than in cases involving other tortfeasors." 230 Kan. at 130-31.

*Leiker v. Gafford*, 245 Kan. 325, involved a constitutional attack upon K.S.A. 1988 Supp. 60-1903, the statute which established a cap of $100,000 for certain nonpecuniary damages in a wrongful death action. After determining that the equal protection issue was subject to the reasonable basis test, the court stated:

"The 'reasonable basis' test is violated only if the statutory classification rests on grounds wholly irrelevant to the achievement of the State's legitimate objective. The state legislature is presumed to have acted within its constitutional power, even if the statute results in some inequality. Under the reasonable basis test, a statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it. *McGowan v. Maryland*, 366 U.S. at 425-26; *Farley v. Engelken*, 241 Kan. at 669; *State ex rel. Schneider v. Liggett*, 223 Kan. at 616.

. . . .

"Under the reasonable basis test, it is unnecessary to ascertain the specific purpose the Kansas Legislature espoused, if any, in establishing the challenged classification. Rather, if *any* state of facts reasonably may be conceived to justify the alleged statutory discrimination, the statute will not be set aside as a violation of equal protection. *McGowan v. Maryland*, 366 U.S. at 426.

"A statute comes before the court cloaked in a presumption of constitutionality, and it is the duty of the party attacking the statute to sustain the burden of proof. *State ex rel. Schneider v. Liggett*, 223 Kan. at 616, and cases cited therein." 245 Kan. at 363-64.

We conclude that K.S.A. 1990 Supp. 40-3403(h) bears a reasonable relationship to the objectives sought by the legislature and does not violate Section 1 of the Bill of Rights of the Kansas Constitution.

### Section 5 of the Bill of Rights of the Kansas Constitution

The next question certified by the federal court is whether K.S.A. 1990 Supp. 40-3403(h) violates Section 5 of the Kansas Bill of Rights, which provides:

"**Trial by jury.** The right of trial by jury shall be inviolate."

Plaintiff contends that the statute violates Section 5 because it takes "away the right of a plaintiff to have damages awarded by

a jury without providing anything in return." Plaintiff argues that the elimination of vicarious liability operates like a cap on damages and limits the plaintiff's right to have the jury award damages. In doing so, the plaintiff relies primarily on *Kansas Malpractice Victims Coalition v. Bell*, 243 Kan. 333, 757 P.2d 251 (1988). In that case the court was faced with the constitutionality of K.S.A. 1987 Supp. 60-3407 and 60-3409 which, *inter alia*, limited recovery of "noneconomic loss" to $250,000 and total recovery to $1,000,000. The court discussed at some length the nature of the right to trial by jury under Section 5 and stated:

"Section 5 of the Bill of Rights of the Kansas Constitution provides that the right of trial by jury shall be inviolate. It guarantees the right of every citizen to trial by jury. ' "The right of trial by jury is a substantial and valuable right. The law favors trial by jury and the right should be carefully guarded against infringement." ' *Waggener v. Seever Systems, Inc.*, 233 Kan. 517, 520, 664 P.2d 813 (1983) (quoting *Bourne v. Atchison, T. & S. F. Rly. Co.*, 209 Kan. 511, 497 P.2d 110 [1972]). 'Trial by jury is guaranteed only in those cases where the right existed at common law.' *Kimball et al. v. Connor et al.*, 3 Kan. \*414, \*432 (1866). Common law allows for the recovery of damages for negligent injury (*Tefft v. Wilcox*, 6 Kan. \*46 [1870]), and therefore the right to jury trial applies here.

"Kansas cases hold that the right to a jury trial includes the right to have a jury determine damages. Plaintiffs contend that the cap provisions of H.B. 2661 impair the right to a jury trial 'by truncating the jury's ability to fix damages.'

"The jury's traditional role is to decide issues of fact. *Hasty v. Pierpont*, 146 Kan. 517, 520-21, 72 P.2d 69 (quoting *Walker v. Southern Pacific Railroad*, 165 U.S. 593, 596, 41 L. Ed. 837, 17 S. Ct. 421 [1897]). The determination of damages is an issue of fact. Therefore, it is the jury's responsibility to determine damages. . . ."

"Further support for the conclusion that Section 5 includes the right to have a jury determine damages comes from the ancient distinction between legal and equitable actions. At common law and under the Kansas Constitution, a party in a suit in equity (such as an action for specific performance, foreclosure, or to quiet title) is not entitled to a trial by jury. *Waggener v. Seever Systems, Inc.*, 233 Kan. 517. On the other hand, suits seeking monetary recovery or money damages have always been considered actions at law which must be considered by a jury unless waived. *Windholz v. Willis*, 1 Kan. App. 2d 683, 686, 573 P. 2d 1100 (1977). See *City of Osawatomie v. Slayman*, 182 Kan. 770, 323 P.2d 910 (1958). The right to a jury trial, then, turns on the type of remedy sought. It would be illogical for this court to find that a jury, empaneled because monetary damages are sought, could not then fully determine the amount of damages suffered." 243 Kan. at 342-43.

Plaintiff's reliance upon *Malpractice Victims* and his arguments in support of his contention that the statute violates the constitutional right to a trial by jury are misplaced. Nothing in the statute limits the jury's right to determine the full amount of damages due the injured plaintiff and nothing limits the jury's right to assess the full amount of such damage against the actual tortfeasor. Likewise, nothing in the statute limits the plaintiff who recovers such a judgment from resorting to every legal means available to collect the full amount of the judgment from the tortfeasor. The elimination of the vicarious liability of the non-negligent employer has no effect whatsoever upon the jury's factual determinations of the amount of damages or the extent of the liability of the negligent health care provider. The constitutional right to trial by jury does not guarantee that every jury damage award will be collectible or guarantee any source for payment of such an award. The duty of the jury is to determine liability and determine the amount of damages suffered. It has nothing to do with the collection of the damages. As we stated in *Manzanares v. Bell*, 214 Kan. 589, 616, 522 P.2d 1291 (1974), the statute "represents a legislative change in tort liability reparation and does not violate the right to trial by jury."

K.S.A. 1990 Supp. 40-3403(h) does not deprive the plaintiff of the constitutional right of trial by jury and does not violate Section 5 of the Bill of Rights of the Kansas Constitution.

## Section 18 of the Bill of Rights of the Kansas Constitution
Section 18 of the Kansas Bill of Rights provides:

"**Justice without delay.** All persons, for injuries suffered in person, reputation or property, shall have remedy by due course of law, and justice administered without delay."

Plaintiff contends K.S.A. 1990 Supp. 40-3403(h) violates Section 18 because it abolishes a remedy previously held by medical malpractice victims without providing an adequate substitute remedy or quid pro quo. Plaintiff, relying upon *Neely v. St. Francis Hospital & School of Nursing*, 192 Kan. 716, 391 P.2d 155 (1964), compares the elimination of vicarious liability here to the statute which prohibited garnishment in *Neely*. In *Neely* the statute under attack (G.S. 1949, 17-1725 [1959 Supp.]) provided that the property of nonprofit hospital corporations was exempt from at-

tachment, garnishment, execution, or forced sale except for obligations owed to a governmental entity or obligations contractually incurred by the corporation. Neely had obtained a malpractice judgment against St. Francis Hospital, which remained partially unpaid, and attempted to collect through garnishment proceedings. The hospital relied upon the statute in asserting that it was exempt from garnishment, and the trial court granted judgment for the hospital.

On appeal by Neely, this court held the statute to be unconstitutional as a violation of Section 18. 192 Kan. at 723. In doing so, the court relied upon its earlier decision in *Noel v. Menninger Foundation*, 175 Kan. 751, 267 P.2d 934 (1954), wherein the court abolished the common-law doctrine of tort immunity granted to charitable and nonprofit organizations. In *Noel* the plaintiff suffered injury through acts of negligence by a Menninger employee. Though recognizing that a grant of immunity to charitable institutions may have been a basis for encouraging charity and that charitable institutions had limited resources in public funding early in history, the court in *Noel* found these concerns no longer existed. The court not only found the public policy and need behind the doctrine of charitable immunity no longer viable but also found the doctrine violated Section 18 of the Kansas Bill of Rights.

The *Noel* court, in discussing Section 18, stated:

"It is somewhat surprising to note that in none of the decisions establishing the immunity doctrine in this state was the question ever presented or consideration given to the provisions of our constitution. Section 18 of our bill of rights reads: 'All persons, for injuries suffered in person, reputation or property, shall have remedy by due course of law, and justice administered without delay.' It is clear from plaintiff's petition that he has suffered injuries in person, and under our state constitution he shall have remedy by due course of law. (*Rowell v. City of Wichita*, 162 Kan. 294, 300, 176 P.2d 590.) Neither our constitution nor our statute says anything about releasing charitable, educational or religious organizations from liability for negligence which results in personal injuries to another. Section 18 of our bill of rights is to the contrary. Thus it would appear that the public policy of this state, as enumerated by its constitution, is to put justice 'by due course of law' above or before charity. The constitution, article 11, section 1, and our statute, G.S. 1949, 79-201, do make provisions for releasing such institutions from taxation. Had it been the intent of the framers of our constitution to grant immunity to charitable organizations for their torts,

provisions would have been made for such. The constitutional provision guaranteeing to every person a remedy by due course of law for injury done him in person or property means that for such wrongs that are recognized by the law of the land the court shall be open and afford a remedy, or that laws shall be enacted giving a certain remedy for all injuries or wrongs. 'Remedy by due course of law,' so used, means the reparation for injury ordered by a tribunal having jurisdiction in due course of procedure after a fair hearing. It is the primary duty of the courts to safeguard the declaration of right and remedy guaranteed by the constitutional provision insuring a remedy for all injuries. (11 Am. Jur. 1124, 1125, Constitutional Law, § 326.)

"To exempt charitable and nonprofit corporations from liability for their torts is plainly contrary to our constitutional guaranties (Bill of Rights, § 18). It gives to certain favored ones, selected arbitrarily, immunity from that equal liability for civil wrongs which is a sign of equality between citizens. It undertakes to clothe charitable and nonprofit organizations with special privileges denied to other corporations, and society. It takes from individuals the right to assert in the courts claims against all who tortiously assail their person and property and to recover judgment for the injuries done. It prevents all persons from having recourse to law for vindication of rights or reparation for wrongs against the privileged charitable, nonprofit organization. It frees one set of corporations from obligations to which their competitors, and individuals, are subjected. In short, it destroys equality and creates special privilege. (*In re Opinion of the Justices*, 211 Mass. 618, 98 N.E. 337.)

"For the foregoing reasons, we are of the opinion that if public policy ever required that charitable institutions should be immune from liability for the torts of their servants, that public policy no longer exists." 175 Kan. at 762-63.

Plaintiff asserts that the statutory abrogation of vicarious liability now before the court constitutes the denial of a remedy under Section 18 in the same manner as did the charitable immunity in *Noel* and the garnishment exception in *Neely*. It could be argued that the court in *Noel* mixed an equal protection analysis under Section 1 with its concerns under Section 18 and that the basis of the decision was actually a Section 1 equal protection determination rather than a violation of the Section 18 requirement of a "remedy by due course of law." Regardless of the basis for the decision in *Noel*, we think it is clear that the statutory curtailment of vicarious liability does affect a "remedy" within the purview of Section 18.

It has long been recognized that no one has a vested right in common-law rules governing negligence actions which would preclude substituting a viable statutory remedy for one available at

common law. *Manzanares v. Bell,* 214 Kan. at 599. As stated in *Kansas Malpractice Victims Coalition v. Bell,* 243 Kan. at 350, "The legislature can modify the common law so long as it provides an adequate substitute remedy for the right infringed or abolished." Therefore, the issue we must now determine is whether the legislature has provided a sufficient quid pro quo, or substitute remedy, for its abrogation of the common-law doctrine of vicarious liability as it applied to employer health care providers.

Plaintiff contends no adequate remedy has been provided, because the original quid pro quo of the Act, mandatory insurance and excess coverage provided by the Fund, was enacted long before the adoption of K.S.A. 1990 Supp. 40-3403(h), which modifies or supplements the original act. Defendants take the position that the original remedy provided by the Act, mandatory insurance and Fund coverage, provides a sufficient substitute remedy and does not preclude subsequent modification or fine tuning of some provisions of the Act.

The Health Care Provider Insurance Availability Act was a comprehensive compulsory insurance plan mandating minimum amounts of malpractice insurance as a condition of providing health care in Kansas. The purposes and details of the Act have been discussed and reviewed in numerous cases and we need not repeat that history here. See *Kansas Malpractice Victims Coalition v. Bell,* 243 Kan. 333, 757 P.2d 251 (1988); *State ex rel. Schneider v. Liggett,* 223 Kan. 610, 576 P.2d 221 (1978). The Act, as originally adopted, consisted of nineteen sections (K.S.A. 1976 Supp. 40-3401 through 40-3419; L. 1976, ch. 231), practically all of which have been amended one or more times or repealed, and four new sections have been added (K.S.A. 40-3420 through 40-3423). Some of the changes in the original Act have been beneficial to malpractice claimants while others have benefited medical care providers and/or the Fund.

Recognizing that Section 18 of the Kansas Bill of Rights requires an adequate substitute remedy before the legislature can abolish a common-law remedy, the question squarely before us is whether a quid pro quo providing a substitute remedy must be adopted simultaneously with the abrogation of the common-law remedy. Put another way, is the substitute remedy granted upon original adoption of the Act sufficient to support subsequent changes in

the Act abrogating a common-law remedy which was not affected by the original terms of the Act?

In asserting that the substitute remedy must be provided at the same time as the common-law remedy is abolished or limited, the plaintiff relies heavily on *Malpractice Victims*. In that case, this court held that statutes limiting a medical malpractice victim's recovery of noneconomic losses and total recovery to a certain amount and requiring future benefits to be paid from an annuity violated Section 18 because they infringed upon the malpractice victim's right to a remedy without providing an adequate substitute remedy or quid pro quo. 243 Kan. at 352. In doing so, the court adopted the position that "[t]he legislature can modify the common law so long as it provides an adequate substitute remedy for the right infringed." 243 Kan. at 350. "[T]he court looks to insure that due process requirements are met and, when a common-law remedy is modified or abolished, an adequate substitute remedy must be provided to replace it." 243 Kan. at 346-47. The court did not adopt defendants' argument that the guaranteed insurance recovery provided in the original Act was a sufficient quid pro quo for subsequently placing a monetary cap on recovery. Instead, the court stated:

"Assuming, then, that H.B. 2661 limits a plaintiff's right to a remedy under Section 18, we must then decide if the plaintiff has received a *quid pro quo*, or an adequate substitute remedy. Again, defendant and intervenors argue that the plaintiff receives a guaranteed recovery because doctors will have available, affordable insurance coverage. In a somewhat circular argument, they contend that H.B. 2661 lowers the cost of insurance, thereby encouraging doctors to continue their practices, increasing the number of doctors available, and guaranteeing the availability of quality health care to seriously injured malpractice victims. This is not a sound argument. If it were not for negligent health care providers, their victims would not need the continuing health care. The argument also ignores the fact that health care providers have been required to carry malpractice insurance since 1976. Thus a plaintiff's source of recovery is already provided by K.S.A. 40-3402 and K.S.A. 1987 Supp. 40-3404." 243 Kan. at 351.

In *Samsel v. Wheeler Transport Services, Inc.*, 246 Kan. 336, 789 P.2d 541 (1990), the court again considered the need for an adequate quid pro quo in a Section 18 attack upon statutes. The court upheld a legislative cap on recovery for noneconomic losses in personal injury cases, finding no violation of Section 18 or

Section 5 of the Kansas Bill of Rights. The rationale for upholding the constitutionality of this limitation was that a quid pro quo existed. Although the statutes eliminated plaintiff's right to receive noneconomic losses in excess of $250,000, the court found an adequate quid pro quo in that the legislation prevented the court from exercising its discretion to award less than $250,000 when higher damages were awarded by the jury. 246 Kan. at 362.

In reaching this conclusion, the court stated:

"Statutory modification of the common law must meet due process requirements and be reasonably necessary in the public interest to promote the general welfare of the people of the state. Due process requires that the legislature substitute the viable statutory remedy of quid pro quo (this for that) to replace the loss of the right. See generally Note, *Restrictive Medical Malpractice Compensation Schemes: A Constitutional 'Quid Pro Quo' Analysis to Safeguard Individual Liberties*, 18 Harv. J. on Legis. 143 (1981).

"The majority of this court in *Malpractice Victims,* 243 Kan. 333, asserted that the legislature's modification of the common law, by placing caps on the amount of damages an injured plaintiff could recover in medical malpractice actions, without substituting a sufficient quid pro quo, violated the right to have a jury determine damages under §§ 5 and 18. In addition, a statutory scheme of compulsory liability insurance (though purchased by the defendant) was not a quid pro quo for caps on damages suffered by the injured plaintiff, since the liability insurance had been mandated by the legislature prior to the passage of the caps legislation." 246 Kan. at 358.

Although *Samsel*, in referring to *Malpractice Victims*, implies that the substitute remedy must be simultaneous with the abrogation of the common-law remedy, such a determination was unnecessary as the court found a separate, simultaneous quid pro quo had been provided. Thus, any implication in *Samsel* that the substitute remedy must be provided at the same time that a change is made in the existing remedy was not germane to the actual basis for the decision that the statute was constitutional.

Defendants do not contend that K.S.A. 1990 Supp. 40-3403(h), by its terms, provides a separate substitute remedy for the abrogation of the vicarious liability which previously existed for employer health care providers. Hence, we are directly faced with a determination of whether the comprehensive remedy of mandatory insurance and excess coverage from the Fund, provided by the original Act, is a sufficient quid pro quo for this subsequent amendment or modification of the Act.

We have long recognized, at least tacitly, that major statutory enactments establishing a broad, comprehensive statutory remedy or scheme of reparation in derogation of a previously existing common-law remedy may be subsequently amended or altered without each such subsequent change being supported by an independent and separate quid pro quo. Provisions of the original Workmen's Compensation Act adopted in 1911 and upheld as constitutional in *Shade v. Cement Co.*, 92 Kan. 146, 139 Pac. 1193, *aff'd on rehearing* 93 Kan. 257, 144 Pac. 249 (1914), have been repeatedly amended without the adoption of an additional quid pro quo each time an amendment operated to the detriment of the employee. The original quid pro quo providing recovery for injury regardless of fault or negligence has been deemed sufficient to support dozens of amendments to the original act, many of which involved the abrogation of an existing common-law right.

In *Rajala v. Doresky*, 233 Kan. 440, 661 P.2d 1251 (1983), the court, in a unanimous opinion, found that the Kansas Workmen's Compensation Act, in providing immunity to fellow employees when compensation is recoverable under the Act, did not violate Section 18. In doing so, the court expressly stated that it did not "view as significant" the fact that fellow employee immunity was not enacted until 1967. "The Workmen's Compensation Act removes certain common law remedies for injured employees but provides a statutory substitute therefor." 233 Kan. at 441. While not specifically stated, the court obviously held that the 1967 amendment, which provided fellow employee immunity, did not require a new quid pro quo because the comprehensive remedy afforded by the Workmen's Compensation Act, already in existence, was sufficient.

Likewise, the Kansas Automobile Injury Reparations Act, K.S.A. 40-3101 *et seq.*, first adopted in 1974, is a comprehensive legislative scheme affecting the common-law rights of persons injured in vehicle accidents to recover reparations from the negligent parties. The act was upheld against constitutional claims, including Section 18, in *Manzanares v. Bell*, 214 Kan. 589, 522 P.2d 1291 (1974). Since that time the act has been amended numerous times. For example, in 1987, the legislature raised the threshold requirement for medical expenses incurred before a

person could recover damages for pain and suffering and other nonpecuniary damages from $500 to $2,000.

In considering the adequacy of the quid pro quo of comprehensive legislation, which substitutes a statutory remedy for one that formerly existed at common law, and its sufficiency to support subsequent amendments or modifications which diminish the substitute remedy originally granted, no hard and fast rule can apply to all cases. It is obvious that the needs and goals of comprehensive legislation such as the Workers Compensation Act, the Kansas Automobile Injury Reparations Act, and the Health Care Provider Insurance Availability Act will change with the passage of time and the needs of a fluctuating society. It would take the wisdom of Solomon to devise comprehensive remedial legislation, such as that now before us, which would never need fine tuning, change, or modification. The Act is a piece of ongoing legislation which will, of necessity, require continuous modification to accomplish its goals.

The theory behind the common-law doctrine of vicarious liability was that the employer should be liable for the employee's negligence to assure that an innocent injured third party would not have to suffer the loss due to the inability of the tortfeasor employee to respond in damages. Indeed, as pointed out earlier, the employer's liability is secondary to that of the employee and only comes into play when the employee is financially unable to pay the damages. If an employer who is vicariously liable is required to pay damages for the tort of the employee, the employer has a cause of action against the employee to recover the amounts paid. It was never the purpose of the common law to impose liability on a non-negligent third party employer when the actual tortfeasor was financially capable of responding for the injured person's damages.

At the time of the malpractice alleged by the plaintiff in this case, each individual health care provider who was alleged to be negligent was required to maintain $200,000 malpractice coverage and, in addition, the Fund provided $3,000,000 excess coverage for each tortfeasor. Without the Act, there would be no guarantee that a plaintiff injured because of the negligence of a health care provider could ever recover for his injuries, let alone have an assured fund available of $3,200,000. That is a sizeable quid pro

quo, established by the Act, and certainly is an adequate substitute remedy for the common-law rights given up by injured malpractice victims. No argument is made that if the elimination of the employer's vicarious liability had been a part of the original Act, the quid pro quo would somehow be insufficient. We conclude that in reviewing the sufficiency of the substitute remedy as it applies to amendment or modification of comprehensive remedial legislation, each determination must be made on a case-by-case basis. Recognizing that all such legislation may need periodic modification, we think the proper test to apply is whether the substitute remedy would have been sufficient if the modification had been a part of the original Act. If so, then no new or additional quid pro quo is necessary to support the modification against a Section 18 attack. Any other holding would require that every modification of a substitute remedy provided by comprehensive legislation that originally abrogated a common-law remedy would require a new and additional substitute remedy. As already noted, it would be virtually impossible to draft such legislation in a form that would anticipate all contingencies and which would not thereafter need change and modification.

We recognize that there is a limit which the legislature may not exceed in altering the statutory remedy previously provided when a common-law remedy was statutorily abolished. The legislature, once having established a substitute remedy, cannot constitutionally proceed to emasculate the remedy, by amendments, to a point where it is no longer a viable and sufficient substitute remedy. K.S.A. 1990 Supp. 40-3403(h) does not amend the Act to such a degree that the substitute remedy is no longer sufficient and we hold that the statute is not unconstitutional under Section 18 of the Kansas Bill of Rights. Statements in *Samsel*, 246 Kan. 336, and *Malpractice Victims*, 243 Kan. 333, contrary to the views expressed herein are disapproved.

One final matter should be addressed. Although not a part of the question certified by the federal court, the plaintiff attempts to raise the issue that K.S.A. 1990 Supp. 40-3403(h) is not severable from the legislation found to be unconstitutional in *Malpractice Victims*. Any such argument is wholly without merit, as K.S.A. 1990 Supp. 40-3418a specifically provides for severability.

We therefore hold that the answer to the certified question, "Does K.S.A. 40-3403(h) violate Sections 1, 5 and 18 of the Bill of Rights of the Kansas Constitution?" is No.

HERD, J., dissenting: I am apprehensive about our step-by-step retreat from constitutional principles with a convenient technique of rationalizing equal protection and ignoring the required quid pro quo required as a substitute for a "remedy by due course of law." Thus, our written constitution loses its meaning and affords no barrier to the enactment of unjust laws resulting from the transitory public pressures of the moment. Therefore, I dissent.

LOCKETT, J., joins the foregoing dissent.

ALLEGRUCCI, J., dissenting: I join the dissent of Justice Herd and make some additional comments.

I basically agree with the majority's statements of law, but disagree with the majority's rationale in concluding that K.S.A. 1990 Supp. 40-3403(h) does not violate Section 18 of the Bill of Rights of the Kansas Constitution.

As recognized by the majority, " '[t]he legislature can modify the common law so long as it provides an adequate substitute remedy for the right infringed or abolished.' " I disagree, however, that the substitute remedy originally granted by the Health Care Provider Insurance Availability Act, K.S.A. 40-3401 *et seq.*, is an adequate quid pro quo for the subsequent abrogation of vicarious liability as a remedy available to those injured by the negligence of health care providers.

Although further recognizing that the legislature, once having established a substitute remedy, cannot constitutionally proceed to emasculate the remedy, by amendments, to a point where it is no longer a viable and a sufficient substitute remedy, the majority concludes that point has not been reached. The majority arrives at this conclusion by convincing itself that the "sizeable quid pro quo" granted by the passage of the original Act is an adequate substitute remedy to support the continued reduction of the remedies available to injured malpractice victims. Such rationale is nothing more than a legal sleight of hand. I am unable to determine at what point the majority of this court would find

the systematic abrogation of remedies to be constitutionally impermissible.

HERD and LOCKETT, JJ., join the foregoing dissent.