No. 67,056

DEBRA STEPHENSON, *Appellant*, v. SUGAR CREEK PACKING and HARTFORD INSURANCE COMPANY, *Appellees*.

(830 P.2d 41)

Opinion filed April 10, 1992.

*Timothy A. Short*, of Spigarelli, McLane & Short, of Pittsburg, argued the cause, and *Fred Spigarelli*, of the same firm, was with him on the brief for appellant.

*Garry W. Lassman*, of Wilbert and Towner, P.A., of Pittsburg, argued the cause and was on the brief for appellees.

*John M. Ostrowski*, of McCullough, Wareheim & LaBunker, P.A., of Topeka, *Beth Regier Foerster*, of the same firm, and *Thomas E. Hammond*, of Render, Kamas and Hammond, of Wichita, were on the brief for *amicus curiae* Kansas AFL-CIO.

The opinion of the court was delivered by

ALLEGRUCCI, J.: This is an appeal by Debra Stephenson from the district court's entry of judgment affirming the award made to her by the administrative law judge in the Division of Workers Compensation. Appellees are Sugar Creek Packing, Stephenson's employer, and Hartford Insurance Company, the insurance carrier (collectively referred to as Sugar Creek). Stephenson challenges the constitutionality of K.S.A. 1991 Supp. 44-510d(a)(23), which provides that compensation for "repetitive use conditions

occurring in opposite upper extremities" shall be computed as separate scheduled injuries. She is joined in her challenge by *amicus curiae* Kansas AFL-CIO. Stephenson's motion to have the case transferred to this court was granted on November 15, 1991.

The facts are not in dispute. Debra Stephenson began working at Sugar Creek Packing, a meat packing plant, in March 1983. She worked as a "3-M Stripper." Her task involved repetitive gripping, grasping, twisting, and turning with her hands.

In October 1987 Stephenson began experiencing pain, numbness, and swelling in both hands. These problems were worsened by the requirements of her work. By December 12, 1987, she was no longer able to perform her job.

Stephenson underwent surgical carpal tunnel release on her right wrist in July 1988 and on her left wrist in October 1988. She was referred for vocational rehabilitation services until the end of May 1990.

Stephenson was unable to return to work at any wage. She stipulated before the district court that her injury was limited to the upper extremities, without extension into the shoulders.

The sole issue raised in this appeal is whether K.S.A. 1991 Supp. 44-510d(a)(23) violates the equal protection clause of the United States Constitution. Stephenson argues that 44-510d(a)(23) violates the equal protection clause of the Fourteenth Amendment of the United States Constitution in treating "repetitive use conditions occurring in opposite upper extremities" as scheduled injuries rather than as disability to the body as a whole. She contends that 44-510d(a)(23) creates the only classification where injury to both opposite extremities is compensable as separate scheduled injuries. She further contends that the statutory provision is unusual in creating a classification based upon the mechanism of injury.

With regard to the legislative purpose for creating the classification, Stephenson states that it is "unclear from the legislative history." For the sake of her argument, Stephenson adopts the district court's speculation that the State's objective was to reduce workers compensation insurance premiums.

Stephenson contends that the classification created by 44-510d(a)(23) should be subjected to "heightened scrutiny" because of the importance of the right to full compensation for injury.

She mentions that gender-based classifications have been subjected to heightened scrutiny, but she does not argue that this classification is gender based.

She contends that the legislative goal of reducing insurance premiums does not pass muster under any level of scrutiny because the goal could be better served in other ways. She also argues that workers who develop carpal tunnel syndrome, whether from a single trauma or from repeated minute trauma, must receive the same treatment under the law because they are "similarly situated with respect to the legitimate purpose of the law."

*Amicus curiae* Kansas AFL-CIO wants to include in the issue whether the statute violates the equal protection clause of the Kansas Constitution. The issue of state constitutionality does not appear to have been raised in the district court, and it is not raised by appellant Stephenson on this appeal.

With regard to the scrutiny to be given 44-510d(a)(23), Sugar Creek asserts that the rational basis test is appropriate for "social and economic legislation." Sugar Creek states that it is unnecessary to ascertain the purpose of the statute under the rational basis test. For the sake of argument, however, Sugar Creek notes that the district court deemed the purpose to be lessening the cost of workers compensation insurance and the cost to industry of doing business.

Sugar Creek counters Stephenson's argument that there were better means available to the legislature to achieve the same result. Sugar Creek relies on 16 Am. Jur. 2d, Constitutional Law § 237 for the proposition that a court may not substitute its notion of how an objective should be accomplished for that of the legislature.

Sugar Creek states that the calculation of compensation for scheduled injuries is not a deviation from the underlying principle of compensation law because "the schedule theoretically includes a consideration of economic loss in earning power. Larson, Worker's Compensation, (Desk Ed.) § 58.11." Sugar Creek asserts that it is not necessarily true that compensation for a scheduled injury is less than what it would be if the injury were compensated as one to the body as a whole, *i.e.*, as a matter of disability. Sugar Creek argues that there are conditions other than bilateral carpal

tunnel syndrome which depend for compensation under the Act on the mechanism or method of injury—heart and psychiatric conditions and occupational diseases. Finally, Sugar Creek cites *Bair v. Peck*, 248 Kan. 824, 811 P.2d 1176 (1991), for the proposition that amendments to the Act, even ones involving abrogation of common-law rights or detriment to the employee, may be made without upsetting the constitutional balance.

The district court applied the rational basis test to the statute. No reason was expressed for rejecting Stephenson's argument that full compensation for injury is a right sufficiently important to merit heightened scrutiny. A gender basis for heightened scrutiny was rejected because "the thrust of claimant's argument is not on the gender basis" and "there is no basis in the record to conclude that this is a gender based act."

The legislative purpose which the district court said "may be conceived" for classifying bilateral repetitive use conditions of the upper extremities as scheduled injuries is lessening "the cost of workers compensation insurance and cost to industry of doing business." The district court concluded that this purpose justifies the alleged discrimination.

Under the Kansas Workers Compensation Act, injuries such as Stephenson's injury, which do not result in death or total disability, may be compensated either as partial general disabilities, K.S.A. 1991 Supp. 44-510e, or as scheduled injuries, K.S.A. 1991 Supp. 44-510d. In *Hughes v. Inland Container Corp.*, 247 Kan. 407, 422, 799 P.2d 1011 (1990), 44-510e was construed as requiring consideration of "both the reduction of a claimant's ability to perform work in the open labor market and the ability to earn comparable wages." K.S.A. 1991 Supp. 44-510d provides that certain injuries to specified body parts are compensated under a schedule rather than with reference to the individual's loss in earning power.

Stephenson asserts: "The compensation for scheduled injuries is generally substantially less than the compensation which would be due for the same injury if compensated as permanent partial general disability or permanent total disability." The district court made the following statement with regard to the difference in the amount of the compensation:

"The employee suffering carpal tunnel injury is limited to a scheduled injury award whereas the employee suffering injury to both upper extremities other than from repetitive use is entitled to compensation as and for disability to the body as a whole; a significant distinction in terms of the amount of monetary compensation available in the usual situation."

Sugar Creek takes issue with this assertion. It postulates circumstances in which

"one may have a scheduled injury and sustain no lost time and no work disability (that is no loss of ability to obtain work on the open labor market and earn a comparable wage). In that instance he would probably receive more under the schedule than he would if he had not come under the schedule."

Stephenson received $41,765.85 for her bilateral carpal tunnel condition under 44-510d. There is nothing in the arguments or the record from which a conclusion can be drawn as to the amount she might have been awarded under 44-510e.

Typical injuries compensated under 44-510d are loss (or loss of use) of finger, toe, hand, foot, arm, leg, and eye, or loss of hearing. Loss of use of one hand due to a repetitive use condition, for example, would be compensated under 44-510d. Before 1987, decisions of this court and the Court of Appeals allowed a worker to be compensated for a partial disability to the body as a whole under 44-510e rather than under 44-510d when both hands, arms, feet, legs, or eyes were injured. *Murphy v. IBP, Inc.*, 240 Kan. 141, 145, 727 P.2d 468 (1986); *Hardman v. City of Iola*, 219 Kan. 840, 844, 549 P.2d 1013 (1976); *Honn v. Elliott*, 132 Kan. 454, 295 Pac. 719 (1931); *Downes v. IBP, Inc.*, 10 Kan. App. 2d 39, 40, 691 P.2d 42 (1984), *rev. denied* 236 Kan. 875 (1985).

In 1987 the legislature added subsection (a)(23) to 44-510d. It provides as follows:

"Whenever the employee is entitled to compensation for repetitive use conditions occurring in opposite upper extremities, whether occurring simultaneously or otherwise, the compensation shall be computed as separate scheduled injuries to each such extremity and the percentage of loss of use thereof shall be increased by 20% of the determined loss of use to each such extremity." L. 1987, ch. 187, § 6.

According to Stephenson, one result of the amendment was to create a unique classification where injury to both opposite upper extremities is compensable as separate scheduled injuries. An-

other result is dissimilar treatment of carpal tunnel conditions developed from a single trauma and those developed from repeated minute trauma. These dissimilar methods of calculating compensation for the same or similar injuries because they were caused by different mechanisms is, according to Stephenson, an impermissible denial of equal protection.

The parties take it for granted that "repetitive use conditions occurring in opposite upper extremities" refers to carpal tunnel syndrome. There does not seem to be any question that carpal tunnel syndrome, Stephenson's condition, is intended to be at least among the conditions described by the statutory phrase.

There is another matter which the court is being asked to take on faith. It is that carpal tunnel conditions may result from a single trauma. Stephenson merely assumes that it occurs. *Amicus curiae* makes the following assertion:

"There is also no question that the exact same injury suffered by appellant Stephenson, carpal tunnel, can also be obtained from occupational causes other than repetitive trauma. According to Orthopaedics, 4th Edition, by Samuel L. Turek, 1984, in some patients carpal tunnel develops from trauma, such as after a displaced Colles' fracture. (p. 1084)."

There is nothing in the record which establishes or refutes that carpal tunnel syndrome may result from a single trauma. We note that, in *Martin v. Cudahy Foods Co.*, 231 Kan. 397, 646 P.2d 468 (1982), this court recognized that tenosynovitis is a condition resulting from either single or repetitive trauma. Tenosynovitis was defined as

"a condition that generally develops over a period of time as opposed to being the result of a single traumatic occurrence and results in the inflammation of a tendon and its sheath. It is not confined to the wrist but may occur in various parts of the body when the tendons are subjected to repeated cyclic activities which might be described as repeated small traumas occurring over a long period of time. It may also result from puncture wounds, contusions and lacerations, or be caused by lymphatic extension from an abrasion. Taber's Cyclopedic Medical Dictionary (12th Ed. 1973, p. T-16)." 231 Kan. at 399.

We concluded that "[t]hus it is clear that tenosynovitis may be incurred from various types of activity or from individual incidents of trauma or injury." 231 Kan. at 400. Tenosynovitis is among the conditions described in 44-510d if it develops from "repetitive trauma" rather than a "single trauma." Workers suffering from

tenosynovitis in the opposite upper extremities would be treated dissimilarly based upon whether the condition developed from a "single" or "repetitive" trauma.

As quoted in *State ex rel. Schneider v. Liggett*, 223 Kan. 610, 613, 576 P.2d 221 (1978), the United States Supreme Court has described the concept of "equal protection" as one which "emphasizes disparity in treatment by a State between classes of individuals whose situations are arguably indistinguishable." *Ross v. Moffitt*, 417 U.S. 600, 609, 41 L. Ed. 2d 341, 94 S. Ct. 2437 (1974). Whether or not the legislation passes constitutional muster depends on the relationship borne by the challenged classification to the objective sought by its creation. In the present case this court must examine the relationship between the classification of workers suffering from repetitive use conditions occurring in opposite upper extremities and the objective which was to be served by singling out this group for separate treatment.

The examination of the relationship between the classification and the objective has become quite formalized. The United States Supreme Court articulates and applies three degrees of scrutiny when examining the relationship. The various levels of scrutiny were reviewed by this court in *Farley v. Engelken*, 241 Kan. 663, 669-70, 740 P.2d 1058 (1987).

The least strict scrutiny is referred to as the "rational basis" test. Relevance *is* the only relationship required between the classification and the objective. In *McGowan v. Maryland*, 366 U.S. 420, 425, 6 L. Ed. 2d 393, 81 S. Ct. 1101 (1961), it was explained that "[t]he constitutional safeguard is offended only if the classification rests on grounds wholly irrelevant to the achievement of the State's objective." Insofar as the objective is concerned, "[a] statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it." 366 U.S. at 426. Thus, it appears that the legislature's purpose in creating the classification need not be established. The classification must, however, bear a rational relationship to a legitimate objective. As noted by Justice Marshall in his dissent in *Lyng v. Automobile Workers*, 485 U.S. 360, 375, 99 L. Ed. 2d 380, 108 S. Ct. 1184 (1988):

"The Court fails to note, however, that this standard of review, although deferential, ' "is not a toothless one." ' *Mathews v. De Castro*, 429 U.S.

181, 185 (1976), quoting *Mathews v. Lucas*, 427 U.S. 495, 510 (1976). The rational-basis test contains two substantive limitations on legislative choice: legislative enactments must implicate legitimate goals, and the means chosen by the legislature must bear a rational relationship to those goals. In an alternative formulation, the Court has explained that these limitations amount to a prescription that 'all persons similarly situated should be treated alike.' "

The intermediate level of scrutiny is termed "heightened scrutiny." *Farley v. Engelken*, 241 Kan. at 669. "It requires the statutory classification to substantially further a legitimate legislative purpose." 241 Kan. at 669. Another, perhaps stronger, statement of the heightened scrutiny test is that the classification "must serve important governmental objectives and must be substantially related to achievement of those objectives." *Craig v. Boren*, 429 U.S. 190, 197, 50 L. Ed. 2d 397, 97 S. Ct. 451 (1976).

The highest level of scrutiny requires that the defendant demonstrate "that the classification is necessary to serve a compelling state interest." *Farley v. Engelken*, 241 Kan. at 670. This "strict scrutiny" test has been applied by the United States Supreme Court in cases involving classifications such as race and fundamental rights guaranteed by the federal Constitution. It has not been advocated by parties to the present case that the classification created by 44-510d(a)(23) should be subjected to strict scrutiny.

Stephenson and *amicus curiae* do urge this court to apply the heightened or intermediate level of scrutiny. They offer different rationales for heightening the scrutiny.

*Amicus curiae* argues that the intermediate level of scrutiny is appropriate because the classification is much more detrimental to women than to men and the legislature was aware of the discriminatory effect at the time of enactment. *Amicus curiae* concedes that the statute does not expressly distinguish between male and female injured workers. The classification, therefore, is not by gender as the unconstitutionally discriminatory classifications were in *Craig v. Boren*, 429 U.S. 190 (sale of 3.2% beer prohibited to males under 21 and to females under 18), and *Reed v. Reed*, 404 U.S. 71, 30 L. Ed. 2d 225, 92 S. Ct. 251 (1971)

(probate code required that males be preferred to females where persons of equal entitlement sought to administer an estate).

*Amicus curiae* argues that the classification, although gender neutral on its face, is gender related. *Amicus curiae* argues that the legislature was cognizant that the statutory provision it was enacting would affect more women than men. However, there is no real proof in the record that 44-510d(a)(23) will adversely affect more women than men. The legislative committees which considered the proposed amendment were told by various witnesses that women were more susceptible than men to developing carpal tunnel conditions. The record available to this court is not adequate to make such a finding. It contains assertions and opinions but no facts. The trial court correctly found that there is no basis in the record to conclude the characteristic is gender based. Thus, the determination of the constitutionality of 44-510d(a)(23) is not governed by the United States Supreme Court gender-based discrimination cases in which an intermediate level of scrutiny is applied to the relationship between the classification and the objective.

Stephenson relies on the reasoning in *Farley v. Engelken*, 241 Kan. 663, and *Wentling v. Medical Anesthesia Services*, 237 Kan. 503, 701 P.2d 939 (1985), for her position that an intermediate level of scrutiny should be applied to the classification created by 44-510d(a)(23). She urges that the important nature of the right to full compensation warrants heightened scrutiny.

Stephenson's reliance on the reasoning in the principal opinion in *Farley* is misplaced, as explained in *Bair v. Peck*, 248 Kan. 824; *Samsel v. Wheeler Transport Services, Inc.*, 246 Kan. 336, 355, 789 P.2d 541 (1990); and *Leiker v. Gafford*, 245 Kan. 325, 363, 778 P.2d 823 (1989). Justice Lockett, writing for the court in *Samsel*, stated:

"[O]nly Justice Herd, the author of the opinion, and then Chief Justice Prager applied the heightened scrutiny analysis. Two justices, Justices Lockett and Allegrucci, concurred in the result but disagreed with the application of the heightened scrutiny test and applied the rational basis test. Both agreed that equal protection requires that all who are injured by another's negligent act have an equal right to compensation from the negligent tortfeasor, regardless of any classification that the legislature has attempted to impose. If the legislature wishes to change the rules of evidence by abrogating the collateral source rule, it may do so if applied equally to all who

are injured by the negligent act of another. The three dissenting justices also applied the rational basis test." 246 Kan. at 355.

As this court noted in *Farley*, the classifications which have been subjected to middle-level scrutiny by the United States Supreme Court are ones based on gender and on legitimacy. 241 Kan. at 669.

In *Wentling*, the collateral source rule, as it was codified before repeal by the 1985 legislature, was held to be in violation of the equal protection guarantees of the federal and Kansas Constitutions. The statute, K.S.A. 60-471, abrogated for certain medical malpractice plaintiffs elements of the common-law rule precluding evidence of compensation from a source other than tortfeasors. 237 Kan. at 515-16.

The majority opinion quoted from *Doran v. Priddy*, 534 F. Supp. 30, 37 (D. Kan. 1981), to the effect that heightened scrutiny was warranted due to the "putativeness" of the discrimination between classes of plaintiffs which "is lodged within the heart of the judicial process." 237 Kan. at 518.

The federal court in *Doran* tested the constitutionality of K.S.A. 60-471 by applying an intermediate level of scrutiny to the relationship between the classification and the objective. That is, it examined whether the classification furthered the legislative goal. A majority of the members of this court agreed with the following conclusions from *Doran*:

" 'This statute is intended to keep down the costs of medical malpractice insurance, and to limit the size of medical malpractice verdicts. The distinction between insured plaintiffs, and ones who must rely upon kindness for some of their pre-litigation care, is not one which furthers that goal. Rather, it substantially undermines that purpose, and at the expense of the indigent litigant. It therefore is violative of the right of all litigants to equal protection under the Fourteenth Amendment to the United States Constitution.' " *Wentling v. Medical Anesthesia Services*, 237 Kan. at 518 (quoting *Doran*, 534 F. Supp. at 37).

*Farley* contains the following discussion of the decision in *Wentling*:

"Judge Theis [in *Doran*] concluded that, because of the important nature of the rights affected by the statute under review, the court must apply a more stringent standard of review than that applied under the rational basis test. Thus, in *Wentling*, without specifically so stating, we applied the height-

ened scrutiny test under the United States Constitution." 241 Kan. at 670-71.

The question in *Farley* was whether K.S.A. 1986 Supp. 60-3403, successor to the statute considered in *Wentling*, violated the equal protection clause of the Bill of Rights of the Kansas Constitution.

Referring to the application of the heightened scrutiny test to the statutory abrogation of certain elements of the collateral source rule in *Wentling*, the *Farley* court stated:

"While we are concerned here with the same issue, as hereinafter demonstrated, the Kansas Constitution affords separate, adequate, and greater rights than the federal Constitution. Therefore, we clearly and expressly decide this case upon Sections 1 and 18 of the Kansas Bill of Rights." 241 Kan. at 671.

Section 1 of the Kansas Bill of Rights is the equal protection clause.

The *Farley* court looked to the opinion of Justice Prager in *Ernest v. Faler*, 237 Kan. 125, 697 P.2d 870 (1985), which reversed the summary judgment entered against a plaintiff, who was damaged by a pesticide application, for failure to file notice as required by K.S.A. 2-2457.

Applying Justice Prager's reasoning to the abrogation of the collateral source rule, this court in *Farley* stated:

"Admittedly, 60-3403 does not eliminate a medical malpractice victim's right to bring suit. However, it impairs his remedy if a jury determines the victim is not entitled to full compensation from the defendant because the victim has received benefits from independent sources.

"While we do not reach the issue of whether 60-3403 violates Section 18 of the Kansas Bill of Rights, we find that the right of a victim of medical malpractice to a remedy against the person or persons who wronged him is sufficiently threatened by 60-3403 to require a higher standard of review than the rational basis test." 241 Kan. at 672.

Stephenson urges that the same reasoning should apply here. K.S.A. 1991 Supp. 44-510d(a)(23), like 60-3403, does not eliminate an injured person's right to bring an action for compensation. It does, however, like 60-3403, impair the remedy. It is a statutory curtailment, according to Stephenson, of the remedy which had been substituted when her common-law right to recovery was abrogated. Stephenson contends that her remedy was impaired because she would have been entitled to greater compensation

if her bilateral repetitive use condition had been treated as a disability rather than as a scheduled injury. Thus, her argument logically would continue, her right to a remedy is sufficiently threatened by 44-510d(a)(23) to require a higher standard of review than the rational basis test.

*State ex rel. Schneider v. Liggett,* 223 Kan. 610, involved another legislative response to the medical malpractice "crisis." The constitutionality of K.S.A. 1976 Supp. 40-3401, which required health care providers to obtain professional malpractice liability insurance, was upheld. The equal protection part of that opinion is of note here for its discussion of the curtailed interest's bearing on the level of scrutiny. The intermediate level of scrutiny is ignored; strict scrutiny is said to come into play in cases involving "suspect classifications" or "fundamental interests." 223 Kan. at 617. With regard to the latter, United States Supreme Court cases are cited, holding that the right to an education or to practice a profession are not "fundamental interests." 223 Kan. at 617-18. This explanation was offered: "[T]he determination of a fundamental interest focuses upon whether the right asserted is explicitly or implicitly guaranteed by the Constitution." 223 Kan. at 617. Neither an education nor a professional license is guaranteed by the Constitution. Since K.S.A. 1991 Supp. 44-510d(a)(23) does not affect a fundamental interest or constitute a classification by gender, the proper test to be applied is the "rational basis" test.

Where the rational basis test is the measure of equal protection, "statutory discrimination will not be set aside *if any state of facts reasonably may be conceived to justify it.*" (Emphasis added.) *McGowan v. Maryland,* 366 U.S. at 426. In this regard, Justice Lockett stated in his concurring opinion in *Farley*: "Where the legislature has enacted statutory provisions that do not unequivocally state the public policy, the courts may interpret the intention of the legislature." 241 Kan. at 679. No authority has come to this court's attention which prohibits the court from inferring and supplying a purpose for legislation where it is not expressed, at least for the two least stringent levels of equal protection scrutiny.

Stephenson argues that the legislative goal of reducing insurance premiums for industry does not pass muster under any level

of scrutiny. The most compelling reason she advances is that workers who are similarly situated with respect to the purpose of reducing insurance premiums must receive like treatment under the equal protection clause. She contends that all workers who develop carpal tunnel syndrome arising out of and in the course of their employment (so that the injury is compensable under the Workers Compensation Act) are similarly situated with respect to the purpose of reducing insurance premiums. As a matter of equal protection, therefore, these workers must receive like treatment. As a matter of fact, however, they receive dissimilar treatment. Workers who develop the condition as a result of a single trauma are compensated for their disability while workers who develop the condition as a result of repeated minute trauma are compensated for their scheduled injuries. This dissimilar treatment presumably operates to the financial disadvantage of the latter, although, as noted, Sugar Creek disputes this contention, and it lacks support in the record. However, the only purpose presented to this court for the enactment is the logical one, but also the one seemingly pulled out of the air by the district court—holding down the costs of obtaining workers compensation ·insurance and the costs of doing business for certain Kansas industries. If, as Sugar Creek contends, the compensation paid to an injured worker is not reduced by 44-510d(a)(23), there would be no resulting reduction in insurance premiums or costs to industry and, thus, no objective asserted to justify the classification created by 44-510d(a)(23).

There is no question that K.S.A. 1991 Supp. 44-510d(a)(23) discriminates between workers who suffer loss of opposite upper extremities due to "repetitive" rather than "single" trauma. Is the objective of cutting costs to industry a rational basis for such discrimination? We think not.

In *Lyng v. Automobile Workers*, 485 U.S. 360, the United States Supreme Court upheld an amendment to the Food Stamp Act which denied benefits to strikers and their families. A majority of the Court found the amendment did not violate the equal protection clause of the Fifth Amendment, based upon a finding that the government's goal of maintaining neutrality in labor disputes was a legitimate governmental interest. The government asserted two additional objectives which it argued were sufficient

to justify the amendment: to cut the costs of the program and to direct the limited funds to those with the greater need. Although finding it unnecessary to address the sufficiency of these objectives, the majority noted that although "fiscal integrity" is a "legitimate concern," it does not mean "that Congress can pursue the objective of saving money by discriminating against individuals or groups." 485 U.S. at 373.

Justice Marshall, joined by Justices Brennan and Blackmun, found none of the asserted governmental objectives rationally related to the amendment. As to the objective of cutting costs, Justice Marshall stated:

"According to the Secretary's reasoning, the exclusion of any unpopular group from a public benefit program would survive rational-basis scrutiny, because exclusion always would result in a decrease in governmental expenditures. Although it is true, as the Court observes, that preserving the fiscal integrity of the Government ' "is a legitimate concern of the State," ' *ante*, at 373, quoting *Ohio Bureau of Employment Services v. Hodory*, 431 U.S. 471, 493 (1977), this Court expressly has noted that 'a concern for the preservation of resources standing alone can hardly justify the classification used in allocating those resources.' *Plyler v. Doe*, [457 U.S.] at 227. We have insisted that such classifications *themselves* be rational rather than arbitrary. See *Reed v. Reed*, [404 U.S.] at 76; *Shapiro v. Thompson*, 394 U.S. 618, 633 (1968). Our cases thus make clear that something more than an invocation of the public fisc is necessary to demonstrate the rationality of selecting strikers, rather than some other group, to suffer the burden of cost-cutting legislation." 485 U.S. at 376-77.

In *Ernest v. Faler*, this court said that the constitutional guarantee of equal protection "require[s] that persons similarly situated with respect to the legitimate purpose of the law receive like treatment." 237 Kan. at 130. This principle was stated in a discussion of *Henry v. Bauder*, 213 Kan. 751, Syl. ¶ 3, 518 P.2d 362 (1974), which voided the former guest statute "for the reason that the classifications provided in that statute were arbitrary and discriminatory and had no rational basis." 237 Kan. at 130.

In the present case, Stephenson's argument unnecessarily narrows the focus of our inquiry. The workers dissimilarly treated are not just those sustaining carpal tunnel conditions from sudden versus repeated trauma, but all workers with bilateral repetitive use conditions of the upper extremities and workers who suffer any other injuries to both opposite extremities. These classifi-

cations of workers are similarly situated with respect to the goal of cost cutting, but they do not receive like treatment. The equal protection guarantee of the United States Constitution does not preclude the State from classifying persons for purposes of legislation, but it does require that persons similarly situated be treated alike.

To discriminate against an injured worker based solely on whether the injury resulted from "repetitive" rather than "a single" trauma is neither a fair nor reasonable distinction. It permits workers suffering similar injuries caused by the same condition to be treated differently. Such treatment is arbitrary discrimination and not classification. It cannot be justified simply because it cuts the cost of doing business, nor can we reasonably conceive of any set of facts to justify it. The classification created by K.S.A. 1991 Supp. 44-510d(a)(23) is discriminatory, arbitrary, and without rational basis. We therefore hold that K.S.A. 1991 Supp. 44-510d(a)(23) is unconstitutional as a violation of the equal protection clause of the United States Constitution.

The judgment of the district court is reversed, and the case is remanded for proceedings consistent with this opinion.