No. 90,702

KIMBERLYN D. HOLT, a minor, by and through KIMBERLY R. HOLT and KENNETH F. HOLT, Her Parents, Natural Guardians, and Next Friends, and KIMBERLY R. HOLT and KENNETH F. HOLT, Individually, *Plaintiffs*, v. WESLEY MEDICAL CENTER, LLC, a Kansas Corporation, D/B/A WESLEY MEDICAL CENTER; WICHITA CENTER FOR GRADUATE MEDICAL EDUCATION, INC., a Kansas Corporation; BENJAMIN J. HARRIS, M.D.; CLIFFORD S. DEPEW, M.D.; JAMES E. DELMORE, M.D.; and TRAVIS W. STEMBRIDGE, M.D., *Defendants*.

(86 P.3d 1012)

Opinion filed March 19, 2004.

*J. Greg Kite*, of Wichita, argued the cause, and *James J. Long*, of Wichita, was with him on the briefs for plaintiffs.

*John H. Gibson*, of Gilliland & Hayes, P.A., of Wichita, argued the cause, and *Michelle M. Watson* and *Matthew D. Tinnel*, of the same firm, were with him on the briefs for defendant Wesley Medical Center, LLC.

*David S. Wooding*, of Martin, Pringle, Oliver, Wallace & Bauer, L.L.P., of Wichita, argued the cause, and *Roger E. McClellan* and *Teresa L. Mah*, of the

same firm, were with him on the briefs for defendants Wichita Center for Graduate Medical Education, Inc. and Benjamin J. Harris, M.D.

*James J. Long* and *Donald S. Andersen*, of Wichita, were on the brief for *amicus curiae* Ashley Raney-Neises.

*Nathan D. Leadstrom*, and *Wayne T. Stratton*, of Goodell, Stratton, Edmonds & Palmer, L.L.P., of Topeka, were on the brief for *amicus curiae* Kansas Hospital Association.

*James R. Howell* and *Kyle J. Steadman*, of Arden J. Bradshaw & Associates, of Wichita, were on the brief for *amicus curiae* Kansas Trial Lawyers Association.

The opinion of the court was delivered by

ALLEGRUCCI, J.: This medical malpractice action was filed by plaintiffs Kimberly R. Holt and Kenneth F. Holt, and their daughter, Kimberlyn D. Holt, by and through her parents in federal court. Defendants are Wesley Medical Center, LLC, d/b/a/ Wesley Medical Center, Wichita Center for Graduate Medical Education, Inc. (WCGME), and Doctors Benjamin J. Harris, Clifford S. Depew, James E. Delmore, and Travis W. Stembridge. Upon the application of plaintiffs, Judge Julie A. Robinson of the United States District Court for the District of Kansas ordered certification of a question of law to this court under K.S.A. 60-3201 *et seq.* The question arises from the legislature's retroactively including WCGME within the statutory definition of "health care provider," thus relieving it of vicarious liability pursuant to K.S.A. 2001 Supp. 40-3403(h). See K.S.A. 2001 Supp. 40-3414(i)(1).

*Amicus curiae* briefs have been filed by Ashley Raney-Neises, the Kansas Trial Lawyers Association, and the Kansas Hospital Association (KHA).

CERTIFIED QUESTION:

DOES THE RETROACTIVE APPLICATION, BY K.S.A. 2001 SUPP. 40-3414(i)(1), OF L. 2001, CH. 204 (S.B. 366), AMENDING K.S.A. 40-3401(f) AND K.S.A. 40-3403(h) OF THE HEALTH CARE PROVIDER INSURANCE AVAILABILITY ACT, DEPRIVE PLAINTIFFS OF A VESTED PROPERTY RIGHT AND VIOLATE § 18 OF THE BILL OF RIGHTS OF THE KANSAS CONSTITUTION AND, IN ADDITION, VIO-

LATE THE EQUAL PROTECTION CLAUSE OF § 1 OF THE BILL OF RIGHTS OF THE KANSAS CONSTITUTION?

The following brief statement of facts is taken from the uncontroverted facts set forth by WCGME and plaintiffs for purposes of a summary judgment motion.

WCGME is comprised of the University of Kansas School of Medicine-Wichita, Wesley Medical Center (Wesley), and Via Christi Regional Medical Center. WCGME is a not-for-profit corporation that at all relevant times employed defendant Benjamin Harris as a resident physician.

WCGME does not hold a license from the Kansas Board of Healing Arts, nor is WCGME licensed as a medical care facility. It is not a hospital, it maintains no medical supplies, and it does not advertise or solicit patients on its own or for the resident physicians it employs. Although WCGME does not engage in the practice of medicine, provide patient services, or provide medical services to the public, the resident physicians WCGME employs do.

The plaintiffs' claim is based upon the negligence of Dr. Harris as an employee and/or agent of WCGME based upon vicarious liability. Wesley contractually agreed to indemnify WCGME for the negligent acts of WCGME's physicians practicing at its facility.

In the months of March and May 2001 in meetings involving Wesley and various legislators, the status of WCGME as a health care provider was discussed. Patricia Dengler, general counsel for WCGME, presented testimony to the Senate Financial Institutions and Insurance Committee on April 26, 2001. She testified that WCGME had been named as a defendant in three medical malpractice actions, where the Health Care Stabilization Fund (Fund) initially advised WCGME that the Fund would provide defense costs and coverage of any settlement or judgment but later advised WCGME that it was not covered by the Fund. Minutes, Senate Fin. Inst. and Ins. Comm., April 26, 2001 (S.B. 366). Dengler proposed amendments to certain sections of the Health Care Provider Insurance Availability Act (Act), K.S.A. 40-3401 *et seq.*, that would bring WCGME within the definition of "health care provider." See K.S.A. 2001 Supp. 40-3401(f).

According to WCGME, Kimberlyn Holt was born at Wesley in Wichita, Kansas, on July 30, 1998. Since birth, she has had profound and permanent medical problems that plaintiffs attribute to negligence on the part of resident physicians, nurses, and other health care providers who participated in the labor and delivery. According to the Holts, the care and treatment of Kimberly Holt July 29-31 and October 22, 1998, resulted in her being unable to have other children and having bladder and urinary tract difficulties. The Holts also assert that they have sustained economic and noneconomic losses due to the continuing medical problems of mother and daughter.

The Holts contend that the retroactive provision of K.S.A. 2001 Supp. 40-3414(i)(1) deprives them of a vested property right in violation of § 18 of the Bill of Rights of the Kansas Constitution. The constitutional provision provides that "[a]ll persons, for injuries suffered in person, reputation or property, shall have remedy by due course of law, and justice administered without delay." Kan. Const. Bill of Rights, § 18. The statute provides:

"Subject to the provisions of paragraph (4), for the purposes of the health care provider insurance availability act, each nonprofit corporation organized to administer the graduate medical education programs of community hospitals or medical care facilities affiliated with the university of Kansas school of medicine shall be deemed to have been a health care provider as defined in K.S.A. 40-3401, and amendments thereto, from and after July 1, 1997."

The negligence alleged by the Holts occurred in 1998, and they filed suit on July 28, 2000. The challenged legislation was enacted in 2001. L. 2001, ch. 204, secs. 1 and 3.

The Holts rely heavily on *Resolution Trust Corp. v. Fleischer*, 257 Kan. 360, 892 P.2d 497 (1995), for support of their position that their tort actions for negligence constitute a vested property right. In *Fleischer* the question "Under Kansas law, does the holder of accrued tort actions for negligence and breach of fiduciary duty, which have not yet been reduced to judgment have a vested property right in those causes of action?" was one of two questions certified to this court. 257 Kan. at 361, 364-74. Based on its examination of Kansas law and the law of other jurisdictions, the *Fleischer* court concluded that the holder of an accrued tort action

for negligence has a vested property right in that cause of action. 257 Kan. at 374.

There is no question that plaintiffs had an accrued cause of action against WCGME for derivative negligence at the time the challenged legislation was enacted. WCGME, however, argues that because *Fleischer* involves direct rather than derivative liability, the case does not support the Holts' position that their derivative negligence cause of action was a vested property right. WCGME cites this court's caution in restricting the scope of its decision in *Fleischer*: "The weight of authority rests with the [Resolution Trust]. Its common-law causes of action for negligence and negligent breach of fiduciary duty were, *under the facts of this case*, 'vested property rights' under Kansas law. The answer to certified question one is 'yes,' *as qualified by our analysis.*" (Emphasis added.) 257 Kan. at 374. As a matter of fact, the Resolution Trust's suit against former directors of a savings and loan association involved direct rather than derivative liability. Examination of the court's analysis in *Fleischer*, however, reveals no suggestion that the factual difference between direct and derivative negligence might be significant. Principles discussed in the analysis include the difference between procedural and substantive rights, only the latter being protected, and recognition of a link between the moment of accrual of a cause of action and the creation of vested rights. 257 Kan. at 366. In examining cases from other jurisdictions, the court distinguished cases relied on by the defendant directors as merely curing or clarifying defects in existing ambiguous statutes and those involving retroactive legislation aimed at urgent problems of overriding public interest. See 257 Kan. at 370-73. There is no hint that any distinction between direct and derivative liability entered into the court's analysis.

WCGME cites *KPERS v. Reimer & Koger Assocs., Inc.*, 261 Kan. 17, 927 P.2d 466 (1996), for this court's rejection of Reimer & Koger's argument that seeking indemnity was a vested right. The court concluded that a cause of action for indemnity based on tort does not accrue until the indemnitee has suffered an actual loss. 261 Kan. at 40. Hence, were Reimer & Koger found not to be liable to KPERS, there would be nothing for Reimer & Koger to

recover in indemnity. WCGME would draw a parallel with the circumstances of this case, stating that if its employee, Dr. Harris, were found not to be liable to the Holts there would be nothing for the Holts to recover from WCGME. It does not follow, however, that a cause of action for vicarious negligence would accrue only if there were a judgment against Dr. Harris for negligence. The cause of action for negligence against WCGME, like the cause of action for negligence against Dr. Harris, accrued when the alleged negligence occurred in 1998.

WCGME also cites *Nitchals v. Williams*, 225 Kan. 285, 590 P.2d 582 (1979), which determined four separate cases involving disputes between insureds and their insurance carriers over the payment of attorney fees assessed by trial courts against the insurers after a recovery of damages was obtained by the insured from a third-party tortfeasor. The court concluded that "the insurance companies involved had no vested contractual rights prior to July 1, 1977, because in none of the cases had the insured obtained a recovery of damages from the third-party tortfeasor prior to date." 225 Kan. at 294-95. WCGME cites *Nitchals* for the principle that retroactive application of a statute does not impair a vested right where the right had not arisen when the statute became effective. WCGME's point seems to be that the Holts' cause of action against WCGME, because it was based on vicarious liability, was comparable to the insurers' unvested rights in *Nitchals* and had not arisen when K.S.A. 2001 Supp. 40-3414(i)(1) became effective. *Nitchals*, for several reasons, does not support WCGME's position. In *Nitchals*, the challenged statute was determined not to affect the substantive rights of the parties because it was "procedural or remedial in nature" rather than substantive. 225 Kan. 285, Syl. ¶¶ 2-4. In addition, an insurer's right of reimbursement and indemnity under the previous statute is like Reimer & Koger's cause of action for indemnity and unlike the Holts' cause of action against WCGME in that its accrual depended on the occurrence of conditions subsequent to or consequences spawned by the primary tort. A tort cause of action accrues when the elements of duty, breach, and resulting injury or damage are present. 1 Am. Jur. 2d, Actions § 72, p. 769.

*Bair v. Peck*, 248 Kan. 824, 811 P.2d 1176 (1991), is another case cited by WCGME for its contention that a cause of action for vicarious liability is not a vested right. WCGME would infer from the court's upholding the statutory elimination of vicarious liability for health care providers that a cause of action for vicarious liability is not a vested property right. The inference, however, is unwarranted.

The statute challenged in *Bair* was K.S.A. 1990 Supp. 40-3403(h), which provided:

" '(h) A health care provider who is qualified for coverage under the fund shall have no vicarious liability or responsibility for any injury or death arising out of the rendering of or the failure to render professional services inside or outside this state by any other health care provider who is also qualified for coverage under the fund. The provisions of this subsection shall apply to all claims filed on or after the effective date of this act.' " 248 Kan. at 827.

There was no retroactive clause, and no question was raised about claims that may have accrued but not have been filed before the effective date of the statute. The due process argument made to this court was that the statute abolished the vicarious liability remedy previously available to medical malpractice victims without providing an adequate substitute remedy or quid pro quo. A majority of the court rejected the argument, determining that the statutory requirements for minimum amounts of malpractice insurance as a condition of providing health care in this state sufficed as a quid pro quo. 248 Kan. at 844.

The defendants have offered no convincing reason or authority why accrual of a tort cause of action based on vicarious liability for an injury would not also accrue when the elements of duty, breach, and resulting injury are present. The Holts' tort action for negligence against the defendants constituted a vested property right.

The Holts argue that the retroactive provision of K.S.A. 2001 Supp. 40-3414(i)(1) violates their due process rights under § 18 of the Bill of Rights of the Kansas Constitution. It is settled that the constitutionality of a statute is presumed, all doubts must be resolved in favor of its validity, and before the statute may be stricken down, it must clearly appear the statute violates the constitution. In determining constitutionality, it is the court's duty to uphold a

statute under attack rather than defeat it, and if there is any reasonable way to construe the statute as constitutionally valid, that should be done. Statutes are not stricken down unless the infringement of the superior law is clear beyond substantial doubt. *State ex rel. Tomasic v. Unified Gov. of Wyandotte Co./Kansas City*, 264 Kan. 293, 300, 955 P.2d 1136 (1998).

In spite of the presumption of constitutionality, the court in *Fleischer* concluded that the retroactivity of the legislation being challenged "presented an insurmountable constitutional infirmity" because "[s]ubstantive laws affecting vested rights cannot be made retroactive without violating due process." 257 Kan. at 376 (citing *Rios v. Board of Public Utilities of Kansas City*, 256 Kan. 184, 190, 883 P.2d 1177 [1994]; *Harding v. K.C. Wall Products, Inc.*, 250 Kan. 655, 668, 831 P.2d 958 [1992]).

WCGME argues that the challenged legislation in this case presents an exception to the general prohibition against retroactive legislation that impairs substantive rights. It is an exception, according to WCGME, because it was enacted to clarify ambiguities in existing law. WCGME concedes in its brief that "[i]n order to be valid, curative legislation must have been within the legislature's power to enact initially and *must not impair vested rights*." (Emphasis added.) See *State ex rel. Tomasic v. Kansas City, Kansas Port Authority*, 230 Kan. 404, 423, 636 P.2d 760 (1981). The argument seems to be that no vested rights were impaired by K.S.A. 2001 Supp. 40-3414(i)(1) because WCGME was a health care provider all along and the statute merely clarified the status quo.

This court presumes when the legislature revises an existing law that the legislature intended to change the law. *American Trust Administrators, Inc. v. Kansas Insurance Dept.*, 273 Kan. 694, 701, 44 P.3d 1253 (2002). This court also recognizes that

"this presumption may be weak according to the circumstances and may be wanting altogether. [*Board of Sedgwick County Comm'rs v. Action Rent to Own, Inc.*,] 266 Kan. [293,] at 304[, 969 P.2d 844 (1998)]. 'The presumption is fairly strong in the case of an isolated, independent amendment, but is of little force in the case of amendments adopted in a general revision or codification of the law.' *Board of Education of U.S.D. 512 v. Vic Regnier Builders, Inc.*, 231 Kan. 731, 736, 648 P.2d 1143 (1982)." *American Trust*, 273 Kan. at 701.

The retroactive amendment at issue here, K.S.A. 2001 Supp. 40-3414(i)(1), was not part of a general revision or codification of the law concerning health care provider insurance. L. 2001, ch. 204. The amendment at issue instead was one of several provisions, all having to do with nonprofit corporations organized to administer graduate medical education programs, that were inserted into the already existing Act concerning health care provider insurance. The definition section, K.S.A. 40-3401, was amended to include such nonprofit corporations within the definition of health care provider. L. 2001, ch. 204, sec. 1(f). The health care stabilization fund section, K.S.A. 40-3403, was amended to make the fund liable to pay such nonprofit corporations' attorney fees, costs, and judgments or settlements arising out of rendering or failing to render professional services. L. 2001, ch. 204, sec. 2(c)(11) and (12). The health care stabilization fund section also was amended to establish the graduate medical education administration reserve fund, L. 2001, ch. 204, sec. 2(j)(4), and to set the election of fund coverage limits for such nonprofit corporations at the highest option, L. 2001, ch. 204, sec. 2(l). Subsection (h) of the section governing qualification of health care providers as self insurers for purposes of the Act, K.S.A. 40-3414, was amended by adding such nonprofit corporations to the list of qualifying organizations and requiring them to pay the applicable surcharge. L. 2001. ch. 204, sec. 3(h). Subsection (i) was a new subsection added to K.S.A. 40-3414. As we have seen, in (i)(1), the legislature provided that such nonprofit corporations "shall be deemed to have been a health care provider . . . from and after July 1, 1997." L. 2001, ch. 204, sec. 3(i)(1). In (i)(2), the legislature deemed such nonprofit corporations "to have been a self insurer within the meaning of subsection (h) . . . from and after July 1, 1997"; in (i)(3), the election of fund coverage limits for such nonprofit corporations "shall be deemed to have been effective at the highest option . . . from and after July 1, 1997"; and in (i)(4), the legislature exempted such nonprofit corporations from any annual premium surcharge for any period prior to the effective date of the amendments. L. 2001, ch. 204, sec. 3(i)(2), (3), and (4). The annual premium surcharge section, K.S.A. 40-3404, was amended to include such nonprofit corpora-

tions among those required to pay an annual premium surcharge. L. 2001, ch. 204, sec. 4(a).

The effect of the amendments was to make the existing health care provider insurance scheme applicable to an additional category of providers rather than to alter the existing scheme. Under these circumstances, the presumption that when the legislature revises an existing law it intends to change the law is fairly strong. What WCGME offers to overcome the presumption is not.

First, WCGME suggests that it may have been included in 40-3401(f) in the preamendment definition of health care provider as a nonprofit corporation "organized for the purpose of rendering professional services by persons who are health care providers." The preamendment definition of health care provider included several organizational types used by professional groups. Among the organizational types were a professional corporation, a Kansas limited liability company, a partnership, and a Kansas not-for-profit corporation. The latter was included in the definition of health care provider in 1982, as proposed by the Kansas Insurance Department, "in response to information submitted that various professional corporations at the University of Kansas Medical Center would become nonprofit corporations effective July 1, 1982" because up to then only for-profit corporations qualified for Fund coverage. Kansas Insurance Department Bulletin 1982-12.; see L. 1982, ch. 207, sec. 1(f). WCGME, unlike the professional groups who are organized for the purpose of rendering professional services, is organized for the purpose of administering a graduate medical education program.

Second, WCGME in its brief states that Patricia Dengler, its general counsel, told a legislative committee that the amendments WCGME proposed were to clarify WCGME's status as a health care provider under Kansas law. What Dengler actually said was slightly different:

"[I]n 1999, the Stabilization Fund initially informed WCGME that it would provide defense costs and coverage of any settlement or judgment. In conjunction with that information, WCGME was informed that it was a health care provider pursuant to K.S.A. 40-3401(f). The basis of this information was a compliance document that listed WCGME as being in compliance with Fund requirements.

Since 1990, WCGME has paid the Fund the surcharge *for the residents' excess coverage*. Approximately six weeks ago, WCGME was informed that the initial information from the Fund was incorrect due to a clerical error and *WCGME was not covered by the Fund*." (Emphasis added.) Minutes, Senate Fin. Inst. and Ins. Comm., April 26, 2001 (S.B. 366).

In other words, Dengler distinguished between coverage of the residents employed by WCGME and WCGME itself and testified that WCGME knew that it was not covered by the Fund. In concluding her testimony, she used the verb "clarify" but followed it with an explanatory phrase that indicated that "modify" would better have described the action she was asking the legislature to take: "WCGME submits these proposed amendments to clarify the definition of 'health care provider' so that WCGME, SHEF [Salina Health Education Foundation] and the KMEF [Kansas Medical Education Foundation] are included in this definition and can access the protection of the Fund." Minutes, Senate Fin. Inst. and Ins. Comm., April 26, 2001 (S.B. 366).

*Amicus* KHA confirmed the distinction between Fund coverage for resident physicians and Fund coverage for WCGME. On September 15, 2003, it filed a correction to the following statement in its brief: "WCGME paid the Fund for coverage under the Act for over 10 years . . . ." The correction stated that WCGME paid the Fund for coverage only for the resident physicians who participated in the residency program administered by WCGME but did not pay the Fund surcharge for itself as an entity. *Amicus'* counsel wrote:

"It was KHA's understanding when the brief was filed that this statement was true based upon the fact that the Fund initially agreed to defend WCGME and provide coverage for any liability WCGME might have in response to the present suit and another similar case. That coverage decision was later challenged which led WCGME to seek legislation to clarify its right to coverage. However, counsel for KHA has recently received information that WCGME only paid the Fund for coverage for the residents who participated in the residency program administered by WCGME, but did not pay the fund surcharge for itself as an entity. Thus, the statement that 'WCGME paid the Fund for coverage under the Act' is incomplete and implies that it was paying for coverage for itself as an entity rather than only for the residents. KHA would like the record to reflect this distinction in order to avoid the Court or any of the parties from relying upon this incorrect statement."

This court presumes that when the legislature revises an existing law, the legislature intended to change the law, and the presumption is fairly strong where, as here, the amendments were not adopted in a general revision of the law. In this case, WCGME has not offered an effective rebuttal of the presumption.

*Amicus* KHA directs the court's attention to *Fleischer*, where three factors were identified as important in shaping the conclusions of vested rights cases from other jurisdictions: (1) the nature of the rights at stake (*e.g.*, procedural, substantive, remedial); (2) how the rights were affected (*e.g.*, whether partially or completely abolished by the legislation, was any substitute remedy provided); and (3) the nature and strength of the public interest furthered by the legislation. 257 Kan. at 369. Applying these factors in the present case, KHA states that the *Act* is remedial in nature without contending that the *right* at stake is anything other than substantive. Nor does KHA deny that the right was completely abolished and that no substitute remedy was provided. On the third factor, KHA asserts that there is great public interest in health care legislation and implies that the great public interest ought to override due process concerns. KHA cites *Aves v. Shah*, 258 Kan. 506, 906 P.2d 642 (1995), as holding that a significant public interest in health care legislation justifies the abrogation of common-law remedies. In *Aves*, the court gave the following answer to a certified question: "Kansas law does not recognize a claim of bad faith against the Health Care Stabilization Fund for a judgment in excess of the Fund's statutory limit of liability." 258 Kan. at 527. No one quarrels that there is great public interest in health care legislation, but that is not what is under consideration here. What is at issue is the *retroactivity* of a narrow slice of health care legislation, which includes nonprofit corporations organized to administer graduate medical education programs as health care providers for purposes of health care provider insurance. Thus, the question is the nature and strength of the public interest furthered by the legislation's retroactive inclusion of such nonprofit corporations as health care providers. KHA offers no reason why the public interest would be furthered by retroactivity.

In a similar vein, KHA contends that the amendments replaced a doubtful remedy with a superior one for the Holts. The quid pro quo analysis, however, has no place where the challenge is to the retroactivity of an enactment.

Thus, under the facts presented, the retroactive provision of K.S.A. 2001 Supp. 40-3414(i)(1) deprives the Holts of a vested property right and violates their due process rights under § 18 of the Bill of Rights of the Kansas Constitution.

The Holts also contend that K.S.A. 2001 Supp. 40-3414(i)(1) violates the Equal Protection Clause of § 1 of the Bill of Rights of the Kansas Constitution, which provides: "All men are possessed of equal and inalienable natural rights, among which are life, liberty, and the pursuit of happiness." They contend that 40-3414(i)(1) creates unreasonable and arbitrary classifications of medical malpractice victims, namely those whose claims arose before and after July 1, 1997. Those with claims arising before that date would have a claim for vicarious liability against WCGME, but those with claims arising after that date would not.

"This court has traditionally treated malpractice legislation as economic regulation in which the rational basis test is applied. [Citations omitted.]" *Aves*, 258 Kan. at 525. The Holts agree that the rational basis test is applicable here, and they give no consideration to any other level of scrutiny. Under the rational basis scrutiny, a legislative classification will be upheld if it is rationally related to a legitimate legislative purpose. *Thompson v. KFB Ins. Co.*, 252 Kan. 1010, 1018, 850 P.2d 773 (1993).

The Holts would have the court liken the classification of claimants by whether their claims arose before or after July 1, 1997, to the classification in *Thompson*. The statutory classification challenged in *Thompson* made evidence of collateral source benefits admissible in actions in which the claimant demanded damages in excess of $150,000. According to KFB, the legislative purpose was "to compensate 'all tort victims fully for their injuries while reducing or eliminating recoveries by personal injury plaintiffs in excess of the total damages they have suffered.'" 252 Kan. at 1018. The question for the court was whether "the classification of plaintiffs into those seeking $150,000 or less and those seeking more than

$150,000 must bear a rational relationship to the objective of fully compensating without overcompensating injured persons." 252 Kan. at 1019. The court was unable to ascertain any rationality in the legislature's selecting plaintiffs seeking $150,000 or more, rather than some other group, to bear the burden of the legislation. Thus, it held that the classification unreasonably discriminated in favor of claimants demanding $150,000 or less. 252 Kan. at 1023.

The differential treatment in the present case of persons whose causes of action accrued before and after July 1, 1997, differs from the distinction at issue in *Thompson*. The division between classifications in the present case is the effective date of the legislation. All legislation has to have an effective date. The division between classifications in *Thompson*, in contrast, was an arbitrary dollar figure that was neither intrinsic nor necessary to the legislation.

The legislative purpose in selecting July 1, 1997, according to WCGME, was to make it a health care provider during all times relevant to pending litigation against it. Under rational basis analysis, relevance is the only relationship required between the classification and the objective. *Stephenson v. Sugar Creek Packing*, 250 Kan. 768, 774, 830 P.2d 41 (1992). Having to make its enactment effective on some date, the legislature selected a date with the purpose of uniformly affecting all pending litigation against WCGME by making WCGME a health care provider as of July 1, 1997. The legislative classification is relevant to the object of the legislation, certainly as much as the effective date of any legislation would be related to its object. Without the retroactive clause in K.S.A. 2001 Supp. 40-3414(i)(1), WCGME would have been included among health care providers as of May 31, 2001, the date of publication in the Kansas Register. See L. 2001, ch. 204, sec. 6. May 31, 2001, as far as is known, is unrelated to the object of the legislation. Because legislation cannot become effective without an effective date and an effective date always will create before-and-after classifications, equal protection analysis of classifications created by an effective date is of little utility.

In conclusion, we hold that the retroactive provision of K.S.A. 2001 Supp. 40-3414(i)(1) deprives the Holts of a vested property right and violates § 18 of the Bill of Rights of the Kansas Consti-

tution, but it does not violate the Equal Protection Clause of § 1 of the Bill of Rights of the Kansas Constitution.