No. 73,184

DARCY M. AVES, a minor, by and through Dan J. Aves and Faye E. Aves, her Mother and Father, Natural Guardians and Next Friends; DARCY M. AVES, Individually; and DAN J. AVES and FAYE E. AVES, Individually, *Plaintiffs*, v. NASREEN B. SHAH, M.D., *Defendant*, and RON TODD, COMMISSIONER OF INSURANCE, AS ADMINISTRATOR OF THE HEALTH CARE STABILIZATION FUND, *Garnishee*.

(906 P.2d 642)

Opinion filed November 3, 1995.

*Randall E. Fisher*, of Law Offices of Randall E. Fisher, of Wichita, argued the cause, and *Derek S. Casey* and *Chan P. Townsley*, of Hutton & Hutton, of Wichita, *Arden Bradshaw* and *Troy Gott*, of Bradshaw & Johnson, of Wichita, and *Robert L. Howard*, of Foulston & Siefkin, of Wichita, were with him on the briefs for the plaintiffs Aves.

*Richard I. Stephenson*, of Fleeson, Gooing, Coulson & Kitch, argued the cause and was on the briefs for the defendant Shah.

*Steven C. Day*, of Woodard, Blaylock, Hernandez, Roth & Day, of Wichita, argued the cause and was on the brief for the garnishee.

*Wayne T. Stratton*, *Charles R. Hay*, and *David N. Harger*, of Goodell, Stratton, Edmonds & Palmer, L.L.P., of Topeka, were on the brief for *amici curiae* Kansas Hospital Association and Kansas Medical Society.

The opinion of the court was delivered by

ABBOTT, J.: This case is before the court on questions certified by the United States District Court for the District of Kansas under the Uniform Certification of Questions of Law Act, K.S.A. 60-3201 *et seq.* Judge Patrick F. Kelly certified to this court the following questions:

I. Whether, in light of the provisions of the Health Care Provider Insurance Availability Act, Kansas law recognizes a claim of bad faith against the Health Care Stabilization Fund when a judgment is returned in excess of the Fund's statutory limits of liability.

II. May the plaintiffs holding the excess judgment prosecute such a bad faith action against the Fund by way of garnishment in light of K.S.A. 60-723(d)?

The facts as set forth in the district court's order certifying these questions are as follows. Plaintiffs Darcy Aves, a minor, and her parents, Faye and Dan Aves, brought an action in 1988 for medical malpractice against Dr. Nasreen B. Shah and the Central Kansas Medical Center (CKMC) for damages arising from negligence related to Darcy's birth. On November 15, 1990, the jury returned a verdict which found Dr. Shah 90% at fault and CKMC 10% at fault. The jury awarded total damages in excess of $23 million; Dr. Shah's share of the damages was in excess of $21 million. The United States 10th Circuit Court of Appeals affirmed the verdict on appeal. *Aves v. Shah*, 997 F.2d 762 (10th Cir. 1993).

The present action pending before Judge Kelly is a garnishment action filed on October 18, 1993. Plaintiffs contend that Fletcher Bell, the former Commissioner of Insurance of the State of Kansas, serving as Administrator of the Health Care Stabilization Fund (the Fund), acted negligently and in bad faith in conducting the defense of Dr. Shah in the underlying action and in failing to settle the claim. The plaintiffs named Ron Todd as the garnishee in this action. He succeeded Fletcher Bell as Commissioner of Insurance of the State of Kansas.

Judge Kelly made the following assumptions for the purposes of certification: The Fund acted negligently and in bad faith in failing to settle plaintiffs' claims. During 1990, the Fund effectively assumed the defense of Dr. Shah, employing an attorney for her defense. The Fund required this attorney to report to and take directions from the Fund's staff. Prior to and during the trial, the attorney notified the Fund that he did not believe he could obtain a verdict for less than the combined policy limits of Dr. Shah's insurance policies, which was $3.2 million. A second attorney hired by the Fund as an independent advisor also advised the Fund that the plaintiffs would probably receive a verdict for more than $3.2 million. Despite being informed by two attorneys that a verdict in excess of the $3.2 million policy limits was likely, the Fund rejected the plaintiffs' offers to settle for either $3.1 or $3.2 million. Instead, the Fund extended settlement offers of $1.2 million prior to trial and $1.5 million during trial. Representatives of the Fund advised plaintiffs' counsel that they were not concerned with whether Dr. Shah was "stuck" with a big verdict, but they were only concerned with "trying to avoid paying $3.2 million."

Before this court addresses the merits of the case, an understanding of the statutory insurance plan is helpful. In the mid-1970s, the legislature, in response to the high cost and unavailability of medical malpractice insurance, adopted the Health Care Provider Insurance Availability Act (the Act), K.S.A. 40-3401 *et seq*. The Act required licensed health care providers to obtain primary malpractice insurance as a condition precedent to practicing their profession in Kansas. Originally, the Act required a health care provider to obtain primary medical malpractice insurance with at least $100,000 per occurrence coverage and not less than $300,000 annual aggregate coverage for all claims of primary medical malpractice insurance. At the time of the events that are the subject matter of this lawsuit, K.S.A. 40-3402 required a primary coverage of $200,000 per occurrence and not less than $600,000 annual aggregate for all claims.

If a health care provider could not obtain primary malpractice insurance from a private insurance carrier, the Act provided health care providers with primary malpractice insurance through the

Health Care Provider Insurance Availability Plan (the Plan). Thus, the health care provider could purchase primary malpractice insurance from a private insurance carrier or be placed in what amounted to an assigned risk pool in the Plan. The Plan was managed by an insurance company through a contract with the Kansas Insurance Department. Dr. Shah carried a primary malpractice insurance policy through the Plan.

The Act also provides excess medical malpractice insurance through the Fund. While mandatory, a health care provider's excess coverage which is provided by the Fund may be canceled if the Fund determines that the health care provider presents a material risk of significant future liability to the Fund. Originally, the Fund paid all judgments which were beyond the policy limits of the health care provider's primary coverage. Later, the Fund was capped, and it currently only pays $3 million on any judgment above the health care provider's primary policy in any one case.

The Fund itself is funded by a surcharge on the primary policy purchased by all health care providers. The Fund is independently supported by the surcharges. The Fund and the Plan are interrelated in that any loss by the Plan's contract carrier in excess of the premiums paid by the health care provider is made up by the Fund and any profits are paid to the Fund. The State does not pay any of the expenses or losses of either the Plan or the Fund. (The State does pay the premium and surcharges for health care providers employed by the State, for medical students, and for residents of the University of Kansas School of Medicine.) The Fund money is held in a segregated fund in the state treasury (K.S.A. 40-3403[a]). All money in the Fund comes from surcharges against health care providers when they purchase mandatory basic coverage and interest and investment income earned thereon.

When a health care provider is sued for malpractice, the primary coverage insurance carrier may choose to provide a defense for the health care provider, or it may pay its limits to the Fund and the Fund may take over the defense. If the Fund settles a case, the settlement must be approved by a district court judge. K.S.A. 40-3410. On occasion, the Fund has demanded that the primary in-

surance carrier settle within its policy limits or face a negligence or bad faith claim.

The facts submitted to us are that the Fund was not only negligent, but it also acted in bad faith in settlement negotiations. Yet, the persons administering the Fund will experience no financial consequences regardless of the outcome of this case, while the other parties, directly and indirectly involved in the case, will experience severe financial consequences depending upon the outcome. This is the real tension in this case. On the one hand, Dr. Shah will be financially devastated if the Fund is not liable for its refusal to settle within the policy limits. On the other hand, if the Fund is liable for bad faith or negligent failure to settle, it is the health care providers of this State, required by law to participate in the Fund, who will be financially affected by the Fund's liability. The Fund itself will not be affected. Rather, the health care providers will pay for the Fund's liability via an increased surcharge on their basic coverage premiums. This increased surcharge will not cover the medical malpractice of a health care provider but will simply cover the negligence or bad faith of the Fund's administrators in refusing to settle within the statutory limits. This tension is not a factor in this case other than it might have some bearing on legislative intent.

Defendant Commissioner claims that the present action is barred by the provisions of the Act. The Commissioner cites in particular K.S.A. 40-3403(e), K.S.A. 40-3412(c), and a garnishment statute, K.S.A. 60-723(d). K.S.A. 40-3403(e) provides:

"(e) In no event shall the fund be liable to pay in excess of $3,000,000 pursuant to any one judgment or settlement against any one health care provider relating to any injury or death arising out of the rendering of or the failure to render professional services on and after July 1, 1984, and before July 1, 1989, subject to an aggregate limitation for all judgments or settlements arising from all claims made in any one fiscal year in the amount of $6,000,000 for each health care provider."

K.S.A. 40-3412(c) provides: "Nothing herein shall be construed to impose any liability in the fund in excess of that specifically provided for herein for negligent failure to settle a claim or for failure to settle a claim in good faith."

The Commissioner also believes that the garnishment action is barred by K.S.A. 60-723(d), which states:

"All property, funds, credits and indebtedness of the state or of any agency of the state shall be exempt from garnishment, attachment, levy and execution and sale, and no judgment against the state or any agency of the state shall be a charge or lien on any such property, funds, credits or indebtedness."

The plaintiffs bring this garnishment action as Dr. Shah's judgment creditors to collect their judgment against Dr. Shah from the Fund. The plaintiffs contend that the Fund is an insurance company created by statute. They assert that the Fund owed Dr. Shah the obligation to handle the plaintiffs' claims against her in good faith and that the Fund breached this duty. The plaintiffs argue that the provisions of the Act do not prohibit an action for bad faith or negligent failure to settle a claim. The plaintiffs also contend that if K.S.A. 40-3412(c) applies to bar the garnishment action, the statute is unconscionable and unconstitutional. Finally, the plaintiffs assert that K.S.A. 60-723(d) will not bar a garnishment action against the Fund because pursuant to K.S.A. 40-3403(a) the assets held by the Fund are not "state money" but are instead contributions from private providers "held in trust in a segregated fund in the state treasury."

Dr. Shah, united in interest with plaintiffs for the garnishment action, joined the plaintiffs' brief in this court. The Kansas Medical Society (KMS) and the Kansas Hospital Association (KHA) were permitted to jointly file an *amici curiae* brief.

In Kansas, insurance policies are typically considered contracts. *Catholic Diocese of Dodge City v. Raymer*, 251 Kan. 689, 693, 840 P.2d 456 (1992); *Levier v. Koppenheffer*, 19 Kan. App. 2d 971, 976, 879 P.2d 40 (1994). A typical contract contains an implied term that the parties will act in good faith. Specifically, an insurance contract contains an implied term that if the insurer assumes the defense of an insured, then the insurer "owes to an insured the duty to act in good faith and without negligence." *Bolinger v. Nuss*, 202 Kan. 326, Syl. ¶ 1, 449 P.2d 502 (1969). If the insurer negligently or in bad faith refuses to settle a case within the policy limits, the insurer has breached this implied term in the insurance con-

tract. *Glenn v. Fleming*, 247 Kan. 296, 311, 799 P.2d 79 (1990); *Spencer v. Aetna Life & Casualty Ins. Co.*, 227 Kan. 914, 920, 611 P.2d 149 (1980). Thus, a plaintiff who seeks damages from an insurer under a third-party bad faith action must bring the action as a contract claim. *Glenn*, 247 Kan. at 311; *Spencer*, 227 Kan. at 920. Kansas does not allow bad faith actions to be brought in tort. *Glenn*, 247 Kan. at 311; *Spencer*, 227 Kan. at 920. Thus, implicit in the discussion of a bad faith breach of contract action is the necessity of a contract.

There may be questions as to whether a contract existed between the Fund and Dr. Shah or whether a mandatory statutory requirement can ever allow for the creation of a contract, but these are not questions which Judge Kelly certified. The first certified question simply asks this court to determine the viability of a bad faith claim against the Fund "in light of the provisions of the Health Care Provider Insurance Availability Act."

Moreover, the determination of these questions is not necessary to answer the certified questions. Therefore, we assume a contract exists between Dr. Shah and the Fund and proceed to the question of whether there are any provisions in the Act which specifically prevent a plaintiff from bringing a bad faith action against the Fund.

It is helpful to review the basic precepts of statutory construction before addressing the specific statutory provisions which are the basis of the certified question. "It is a fundamental rule of statutory construction to which all other rules are subordinate that the intent of the legislature governs when that intent can be ascertained." *Martindale v. Tenny*, 250 Kan. 621, Syl. ¶ 1, 829 P.2d 561 (1992).

"Legislative intent is a matter of statutory construction, to be determined in a given case from consideration of the language of the statute in connection with the subject matter of the prohibition, the statute's manifest purpose and design, and the consequences of the several constructions to which the statute may be susceptible." *State v. Robinson*, 239 Kan. 269, 271, 718 P.2d 1313 (1986).

"It is presumed the legislature understood the meaning of the words it used and intended to use them in their ordinary and common meaning. Where a statute is plain and unambiguous, the court must give effect to the intention of the legislature as expressed, rather than determine what the law should or should not be." *Chavez v. Markham*, 256 Kan. 859, Syl. ¶ 2, 889 P.2d 122 (1995).

" 'In order to ascertain the legislative intent, courts are not permitted to consider only a certain isolated part or parts of an act, but are required to consider and construe together all parts thereof in *pari materia. When the interpretation of some one section of an act according to the exact and literal import of its words would contravene the manifest purpose of the legislature, the entire act should be construed according to its spirit and reason, disregarding so far as may be necessary the strict letter of the law.' " Todd v. Kelly,* 251 Kan. 512, 516, 837 P.2d 381 (1992) (quoting *Kansas Commission on Civil Rights v. Howard,* 218 Kan. 248, Syl. ¶ 2, 544 P.2d 791 [1975]).

The Fund claims there are two provisions in the Act which prohibit the plaintiffs from bringing a bad faith action against the Fund—K.S.A. 40-3403(e) and K.S.A. 40-3412(c).

K.S.A. 40-3403(e) states:

"In no event shall the fund be liable to pay in excess of $3,000,000 pursuant to any one judgment or settlement against any one health care provider relating to any injury or death arising out of the rendering of or failure to render professional services . . . subject to an aggregate limitation for all judgments or settlements arising from all claims made in any one fiscal year in the amount of $6,000,000 for each health care provider."

The plaintiffs contend that this provision merely sets a policy limit and is not a limit on bad faith liability. As a policy limit, K.S.A. 40-3403(e) sets $3,000,000 as the maximum amount the Fund is required to pay a malpractice victim when the victim receives a judgment against a health care provider, even if the victim's judgment exceeds $3,000,000. Plaintiffs base their claim that this section is not intended to address the liability limits for bad faith on the following statutory language—"any one judgment or settlement *against any one health care provider* relating to any injury or death arising out of the rendering or the failure to render professional services." (Emphasis added.) K.S.A. 40-3403(e).

Plaintiffs contend that this bad faith action is not pursuant to a judgment against a health care provider relating to injury which arose out of the rendering of professional services. Rather, this bad faith action is a claim against the "insurer" Fund. Moreover, this claim is based on the Fund's bad faith refusal to settle; it is not based on an injury arising out of the rendering of professional services. Thus, the plaintiffs contend that a bad faith action is a different type of action than a malpractice action and that the bad faith

claim should not be limited to the $3,000,000 malpractice insurance policy limit.

In *McVay v. Rich*, 255 Kan. 371, 377-78, 874 P.2d 641 (1994), the plaintiff's attempt to make a similar type of argument failed. *McVay* dealt with interpretation of K.S.A. 65-442(b) and K.S.A. 40-3403(h) (a different subsection of the Act). 255 Kan. at 377. K.S.A. 65-442(b) states as follows:

> "There shall be no liability on the part of and no action for damages shall arise against any licensed medical care facility because of the rendering of or failure to render professional services within such medical care facility by a person licensed to practice medicine and surgery if such person is an not employee or agent of such medical care facility."

K.S.A. 40-3403(h) states:

> "A health care provider who is qualified for coverage under the fund shall have no vicarious liability or responsibility for any injury or death arising out of the rendering of or the failure to render professional services inside or outside this state by any other health care provider who is also qualified for coverage under the fund."

In *McVay*, 255 Kan. at 372, the plaintiff, a malpractice victim, sued the hospital in which the malpractice occurred. She argued that she was not suing the hospital based on the doctor's "rendering of or failure to render professional services" within the defendant/hospital, as the above statutes prohibit this. Rather, she contended that the suit against the defendant/hospital was based on the hospital's independent negligence in allowing the doctor to practice in the hospital. This court held that the claim was barred by K.S.A. 65-442 and K.S.A. 40-3403. 255 Kan. at 377-78. This court stated:

> "The clear, unambiguous language of K.S.A. 65-442(b) and K.S.A. 40-3403(h) requires the conclusion that those statutes bar McVay's claim against the hospital. McVay's claim is barred by 65-442(b) because her claim is 'because of' [the doctor's] rendering or failure to render professional services. McVay would have no claim against the hospital if [the doctor] had not negligently treated her . Her claim against the hospital is *derivative of and dependent upon* her claim against [the doctor]."

> "Similarly, McVay's claim against [the hospital] 'arise[s] out [the doctor's] rendering of or the failure to render professional services,' so it is barred by K.S.A. 40-3403(h)." (Emphasis added). 255 Kan. at 377.

The language of the above statutes and McVay's attempt to sue the hospital directly are analogous to the plaintiffs' position in this case. The plaintiffs' action against the Fund is derivative of and dependent upon their claim against the doctor. This action is not a direct action against the Fund. Rather, it is a garnishment action of the judgment against Dr. Shah. Dr. Shah is a named defendant. If the plaintiffs had not received a judgment against a health care provider (Dr. Shah) relating to an injury arising out of the rendering of professional services, then the plaintiffs would not have this garnishment action against the Fund. Thus, this action against the Fund arises out of a judgment against a health care provider and is capped at $3,000,000 pursuant to K.S.A. 40-3403(e).We are satisfied this was the legislature's intent in adopting K.S.A. 40-3403(e).

The Fund also contends that K.S.A. 40-3412(c) prohibits the plaintiffs from bringing a bad faith action against the Fund. K.S.A. 40-3412(c) states: "Nothing herein shall be construed to impose any liability in the fund in excess of that specifically provided for herein for negligent failure to settle a claim or for failure to settle a claim in good faith."

The plaintiffs focus on the language "nothing herein." They contend the provision does not refer to a common-law bad faith action. Rather, the language of the statute simply makes it clear that the legislature has not created a statutory bad faith action anywhere "herein" the statute. While a *statutory* bad faith action may be precluded, plaintiffs contend that this does not prevent them from bringing a *common-law* bad faith action. Thus, according to the plaintiffs, K.S.A. 40-3412(c) does not abrogate a common-law bad faith action against the Fund.

The plaintiffs cite other statutory provisions which contain the language "nothing herein." K.S.A. 66-231a states: "Notwithstanding the foregoing provisions of this section, nothing herein shall be construed as affecting civil liability of any entity for the maintenance or designation of any railroad crossing." Judge Kelly interpreted this language as not abrogating common-law claims. *Hatfield v. Burlington Northern R. Co.*, 757 F. Supp. 1198, 1209 (D. Kan. 1991). However, in formulating this interpretation, the court

relied on a paragraph which precedes the above-quoted clause in the statute. The preceding paragraph states: "The provisions of this section shall be deemed to provide an *additional* and *alternative method* of providing for safety at railroad grade crossings and shall be regarded as supplemental and additional to powers enforced by *other state laws.*" (Emphasis added.) K.S.A. 66-231a. This paragraph together with the "nothing herein" language made it clear to Judge Kelly that K.S.A. 66-231a did not abrogate common-law claims. K.S.A. 40-3412(c) does not have an analogous preceding paragraph. Thus, it may not be interpreted in a similar manner. Moreover, the *Hatfield* holding was reversed in *Hatfield v. Burlington Northern R. Co.*, 958 F.2d 320 (10th Cir. 1992). The 10th Circuit did not specifically address Judge Kelly's interpretation of the "nothing herein" language.

The plaintiffs point to K.S.A. 40-3412(d) and (e), contending that these two provisions are examples of language which does not just preclude the existence of a statutory action but clearly abrogates a common-law action as well. These two provisions state: "The fund shall have no obligations whatsoever for payment for punitive damages." K.S.A. 40-3412(d). "The fund shall not be liable to pay amounts due from a judgment against an inactive health care provider arising from the rendering of professional services as a health care provider contrary to the provisions of this act." K.S.A. 40-3412(e).

The above two statutes use different language than K.S.A. 40-3412(c); thus, the plaintiffs contend the statutes must have different interpretations. *Boatright v. Kansas Racing Com'n*, 251 Kan. 240, 245, 834 P.2d 368 (1992) (" 'It is presumed . . . that the legislature intended a different meaning when it used different language in the same connection in different parts of the statute.' "). According to the plaintiffs, K.S.A. 40-3412(d) and (e) completely abrogate both common-law and statutory liability, while K.S.A. 40-3412(c) simply precludes a *statutory* action for bad faith against the Fund. It does not abrogate the preexisting common-law duty of the Fund to act in good faith.

Moreover, the plaintiffs contend that the statutes' legislative history indicates the legislature did not intend to abrogate the Fund's

common-law bad faith liability. As originally enacted, the Fund did *not* have a policy limit. Without a policy limit, a doctor could never be personally liable for an excess judgment. Without personal liability, a plaintiff could never bring a bad faith action against the Fund. As a result, the plaintiffs contend that the legislature had no need to include a provision which would exempt the Fund from bad faith liability. To interpret K.S.A. 40-3412(c) as exempting the Fund from a common-law bad faith claim—an action which did not exist against the Fund at the time the provision was adopted—is to give the provision a meaningless interpretation. Thus, the plaintiffs argue the legislature must have simply intended for the provision to clarify that the statute itself did not create statutory bad faith liability.

The defendant counters by claiming that the Act was originally *proposed* with a policy limit. With this initial policy limit, common-law bad faith claims would have been possible. Thus, K.S.A. 40-3412(c) was originally intended to prevent common-law bad faith claims. During the legislative process, the policy limit was removed, but the intent of K.S.A. 40-3412(c)—to abrogate common-law bad faith claims against the Fund—remained intact. Therefore, when the policy limit was reinstated, and bad faith claims against the Fund became a possibility, K.S.A. 40-3412(c) exempted the Fund from common-law bad faith liability as it was originally intended to do. We agree with the defendant's analysis of the legislative history of K.S.A. 40-3412(c).

Plaintiffs make other arguments as to why we should find the Fund liable for bad faith or negligent failure to settle, even though we hold that the legislative intent was to cap liability at $3,000,000. First, they contend that estoppel or the law of the case doctrine requires this court to hold the Fund liable for bad faith just as any private insurance company is held liable for bad faith. The plaintiffs also contend that K.S.A. 40-3412(c) is an unconscionable contract term and that it violates due process and equal protection.

Estoppel and law of the case

Relying on *Frevele v. McAloon*, 222 Kan. 295, 301, 564 P.2d 508 (1977), the plaintiffs point out that admissions of a party are bind-

ing. According to the plaintiffs, the Fund has admitted or represented many times to the public and to this court that it is just like a commercial insurance company and that it should be treated as such. For instance, in the Fund's intervenor brief for *Harrison v. Long*, 241 Kan. 174, 734 P.2d 1155 (1987), the Fund stated: "The Fund should be treated just as would any excess insurer." It also stated: "[T]he Fund has the same power and authority to settle claims as would a private insurer." Furthermore, the Fund declared in this same brief: "[T]he statutory scheme gives the Fund the rights and duties comparable to other excess insurers." Thus, according to the plaintiffs, the Fund should now be estopped from claiming that it is not like a commercial insurance company when it comes to bad faith liability.

Neither the Fund nor the court, however, have ever said that the Fund should be treated like a commercial insurance company *in all respects*. For instance, the Fund's *amicus curiae* brief in *Hudgens v. CNA/Continental Cas. Co.*, 252 Kan. 478, 845 P.2d 694 (1993), stated: "Although a *creature of statute*, in many respects the Fund functions like a traditional excess liability carrier." (Emphasis added.) Furthermore, this court has acknowledged in a few cases that the Fund is not identical to a commercial insurance company. For instance, in *Todd v. Kelly*, 251 Kan. at 525, this court stated: "Although the Fund is *not a private insurance company*, we have repeatedly recognized that the entire scheme of the Act and the liability of the Fund are based upon the concept of commercial liability insurance." (Emphasis added.)

Moreover, the defendant argues that even if the Fund had declared in a prior case, "We are liable for bad faith," this statement could not create estoppel unless the parties were identical in the prior suit. See *Reno v. Beckett*, 555 F.2d 757, 770 (10th Cir. 1977). In most cases in which the Fund compared itself to a commercial insurance company, the statements were not made in a case with parties identical to the parties in this case. Thus, the statements may not be used to create judicial estoppel in this case. 555 F.2d at 770. However, in *Todd v. Kelly*, 251 Kan. 512, the parties were identical to the parties here. In *Todd v. Kelly*, the Fund claimed it was similar to a private insurance company. The court noted, how-

ever, that there are some distinctions between the Fund and a private insurance company. 512 Kan. at 525 ("Although the Fund is not a private insurance company . . . .") One of the ways in which the Fund is not a private insurance company is that the Fund is immune from bad faith liability. Thus, even though the parties were identical in a prior case, neither the Fund nor the court made statements equating the Fund to a private insurance company so as to indicate estoppel. Estoppel is not appropriate in this case.

Further, the plaintiffs claim the law of the case doctrine controls because the Fund made statements earlier in *Todd v. Kelly* which equated it with a commercial insurance company. The law of the case doctrine does not apply in this case for the same reasons that estoppel does not apply. The Fund did not say in *Todd v. Kelly* that it was subject to bad faith liability. Rather, the Fund simply argued that it should be treated *like* a commercial insurance company in regards to the *posting of an appeal bond. Todd v. Kelly* does not state that the Fund should be treated like a commercial insurance company in all respects. See 251 Kan. at 525. Thus, the law of the case doctrine is not appropriate in this case.

### Unconscionable Contract Term

The plaintiffs ask this court to assume that the Act created an insurance contract between Dr. Shah and the Fund and that K.S.A. 40-3412(c) is a "term" of this insurance contract. As a term of the insurance contract between Dr. Shah and the Fund, K.S.A. 40-3412(c) prohibits the insured from suing the Fund for bad faith. The plaintiffs claim this type of contract term is unconscionable.

According to the plaintiffs, the term is unconscionable because the Fund has an unequal bargaining position over Dr. Shah. At the time of this action, the Fund was a state-sanctioned excess insurance monopoly. Dr. Shah was required to accept the insurance policy contract on a take it or leave it basis. If she did not accept the insurance contract, she would not have been able to practice medicine in Kansas. See K.S.A. 40-3402(a). Moreover, the plaintiffs reason the term is unconscionable because Dr. Shah, as a party to the contract, did not understand that K.S.A. 40-3412(c) exempted the Fund from bad faith liability. Finally, the plaintiffs

contend the contract term is unconscionable because it deprived Dr. Shah of the common-law remedies to sue the Fund for bad faith without expressly stating so.

In rebuttal, the Fund claims K.S.A. 40-3412(c) is not an unconscionable contract term because it is not a contract term at all. Moreover, the Fund contends the Act does not statutorily create an insurance contract between the Dr. Shah and the Fund in the first place.

Assuming the Act creates an insurance contract between Dr. Shah and the Fund, this does not mean K.S.A. 40-3412(c) is a term of such contract. K.S.A. 40-3412(c) is simply a statutory provision which overrides any contract which may exist. However, even assuming a contract exists and that K.S.A. 40-3412(c) has become a term of such contract, this term is not unconscionable. The plaintiffs contend that the Fund had an unequal bargaining position over Dr. Shah. This is incorrect. While Dr. Shah was required to obtain excess insurance on a take it or leave it basis from the Fund, this does not mean she was in an unequal bargaining position. Dr. Shah received $3,000,000 worth of excess malpractice coverage regardless of her risk factor in return for the condition that she not sue the Fund for bad faith.

Plus, even if Dr. Shah was in an unequal bargaining position with the Fund, such an unequal bargaining position alone is not enough to find a contract term unconscionable. For a contract term to be unconscionable, there must be some type of deceptive practice associated with the term. *Hawes v. Kansas Farm Bureau*, 238 Kan. 404, 406, 710 P.2d 1312 (1985); *Wille v. Southwestern Bell Tel. Co.*, 219 Kan. 755, 759, 549 P.2d 903 (1976). There were no deceptive practices associated with the inclusion of K.S.A. 40-3412(c) in the insurance contract. A contract is only unconscionable if it is so unfair that it shocks the conscience of the court. Although the language in K.S.A. 40-3412(c) may not be the picture of clarity, Dr. Shah is a doctor who should have some knowledge and experience with malpractice insurance. See *Adams v. John Deere Co.*, 13 Kan. App. 2d 489, 497, 774 P.2d 355 (1989) (contract signed by businessman with 40 years of experience was a factor in finding the clause was not unconscionable). For the above-stated

reasons, we find that K.S.A. 40-3412(c) does not create unconscionable contract term.

### Due Process

Next, the plaintiffs contend that if K.S.A. 40-3412(c) immunizes the Fund from bad faith liability, the provision should be struck down as a violation of the Due Process Clause of the Kansas Constitution.

The Due Process Clause of the Kansas Constitution, Section 18 of the Kansas Constitution Bill of Rights, states: "All persons, for injuries suffered in person, reputation or property, shall have remedy by due course of law, and justice administered without delay." This provision guarantees that each person whose property has been injured will receive a remedy. *Resolution Trust Corp. v. Fleischer*, 257 Kan. 360, 375, 892 P.2d 497 (1995).

The plaintiffs contend that their right to bring a bad faith action against the Fund is a remedy for the injury which Dr. Shah and plaintiffs suffered as a result of the Fund's action. K.S.A. 40-3412(c) does not allow the plaintiffs or Dr. Shah to bring a bad faith action against the Fund. Thus, according to the plaintiffs, K.S.A. 40-3412(c) strips Dr. Shah and the plaintiffs of a remedy against the Fund for the injury it caused them, thereby violating Section 18.

However, even if a remedy protected by Section 18 is modified or abrogated by the legislature, such change is constitutional if "the change is reasonably necessary in the public interest to promote the general welfare of the people of the state," *Manzanares v. Bell*, 214 Kan. 589, 599, 522 P.2d 1291 (1974), and the legislature provides an adequate substitute remedy or quid pro quo to replace the vested common-law remedy which has been modified. *Samsel v. Wheeler Transport Services, Inc.*, 246 Kan. 336, 358, 789 P.2d 541 (1990).

The first question is whether there is a significant public interest to justify an abrogation of this bad faith remedy against the Fund. In *Manzanares*, the court addressed the constitutionality of the No-Fault Insurance Act. The no-fault act modified a common-law tort remedy by limiting one's right to recover nonpecuniary losses for

pain and suffering. 214 Kan. at 601. The legislature was attempting to "insure prompt compensation to accident victims injured in the operation or use of a motor vehicle." *Manzanares*, 214 Kan. at 601. Moreover, the legislature was concerned with the overall economic burden placed on the state and its citizens by accident victims who are not compensated or who are forced to resort to litigation to attain compensation. Thus, this court found that the modification of tort liability was valid because it was justified by legitimate public policy interests. 214 Kan. at 608.

The Kansas Legislature had similar concerns when it passed the Health Care Provider Insurance Availability Act. Mandatory malpractice insurance guarantees that malpractice plaintiffs will be able to recover at least some of their judgment against the negligent doctor. Moreover, the legislature immunized the Fund from bad faith claims in hopes that this would keep the Fund surcharge reasonably low. The legislators saw available medical malpractice insurance with reasonably low surcharges as a way to encourage health care providers to practice in Kansas. *Stephens v. Snyder Clinic Ass'n*, 230 Kan. 115, 130, 631 P.2d 222 (1981). Thus, the legislature was concerned with the overall economic burden placed on the state and its citizens by allowing a health care provider to bring a bad faith claim against the Fund. Immunization of the Fund from bad faith claims under K.S.A. 40-3412(c) is necessary "to promote the general welfare of the people of the state." See *Manzanares*, 214 Kan. at 599.

However, even if the modification of a common-law remedy is consistent with public policy, this does not necessarily satisfy the due process concerns. In order to insure due process, the legislature is required to provide an adequate, substitute remedy when a common-law remedy, such as a bad faith claim, is modified or abolished. *Jenkins v. Amchem Products, Inc.*, 256 Kan. 602, 628, 886 P.2d 869 (1994), *cert. denied* ___ U.S. ___ (October 5, 1995).

A quick review of a few cases in which this court has discussed whether the legislature provided an adequate quid pro quo for the abrogation of a remedy is helpful. The *Manzanares* court found that the No-Fault Insurance Act's "prompt, efficient payment of certain economic losses" to accident victims was an adequate sub-

stitute remedy for the modification of nonpecuniary remedies. 214 Kan. at 599. Furthermore, the mandatory availability of no-fault insurance was found to be an adequate substitute remedy even though the injured party was required to purchase the insurance himself or herself. 214 Kan. at 599.

In *Rajala v. Doresky*, 233 Kan. 440, 441, 661 P.2d 1251 (1983), the court found that a reduced burden of proof was an adequate substitute remedy for the abrogation of workers' common-law remedy to sue employers for work-related injuries. *Bair v. Peck*, 248 Kan. 824, 844, 811 P.2d 1176 (1991), found that the mandatory Fund coverage was an adequate quid pro quo for the modification of the vicarious liability remedy. In *Samsel*, 246 Kan. 336, the right to recover more that $250,000 in noneconomic damages was abolished. The court found the legislature provided a quid pro quo in that a district judge could not remit damages to less than $250,000 when the jury awarded damages in excess of $250,000. 246 Kan. at 362.

Here, the health care provider has been deprived of the remedy to recover any damages from the Fund for bad faith breach of contract. The defendant contends that the quid pro quo for abrogation of this remedy is that the health care provider is automatically accepted for primary and excess insurance coverage regardless of his or her risk level. Although the doctor is required to pay for such coverage and the coverage may be canceled by the Fund, this automatic coverage is an adequate quid pro quo. See *Bair*, 248 Kan. at 844. Moreover, the Fund's immunity from bad faith helps keep the Fund's surcharges reasonably low. These low surcharges also qualify as a quid pro quo for Dr. Shah's loss of remedy to bring a bad faith action against the Fund.

K.S.A. 40-3412(c) also strips Dr. Shah's judgment creditors, the plaintiffs in this case, of the remedy to go against Dr. Shah's contract-creditor, the Fund. However, the legislature provided a quid pro quo in that the judgment creditor/plaintiff is guaranteed that all health care providers in the state will have primary insurance coverage plus at least $3,000,000 in excess malpractice insurance coverage. Thus, the medical malpractice victim is guaranteed to recover at least a part of his or her judgment against a negligent

health care provider. Without the Act, the plaintiffs might have received no recovery whatsoever. An adequate quid pro quo has been provided, and K.S.A. 40-3412(c) does not violate the Due Process Clause of the Kansas Bill of Rights.

Equal Protection

Finally, plaintiffs claim that if K.S.A. 40-3412(c) prohibits bad faith claims against the Fund, then the provision violates the Equal Protection Clause of the Kansas Constitution. The principal of equal protection is embodied in Section 1 of the Kansas Constitution Bill of Rights, which states: "All men are possessed of equal and inalienable natural rights, among which are life, liberty, and the pursuit of happiness."

The plaintiffs argue that K.S.A. 40-3412(c) treats health care provider insureds and their judgment creditors differently from any other insureds and judgment creditors. For example, typical commercial insureds or their judgment creditors may bring a bad faith claim against an insurer who refused to settle the insured's policy in bad faith. Yet K.S.A. 40-3412(c) does not allow health care provider insureds or their judgment creditors to bring a bad faith claim against their insurer, the Fund.

The defendant concedes that K.S.A. 40-3412(c) does treat health care provider insureds and their judgment creditors differently from other insureds and judgment creditors. However, the defendant points out that equal protection is only implicated when a statute treats "arguably indistinguishable" classes of people differently. The defendant contends that health care provider insureds are not "arguably indistinguishable" from typical insureds. See *Smith v. Printup*, 254 Kan. 315, 321-22, 866 P.2d 985 (1993).

In *Printup*, the court analyzed whether K.S.A. 60-3701 violated equal protection. K.S.A. 60-3701 allows the court to determine the amount of the punitive damages which should be awarded once the factfinder has determined that they should be allowed. K.S.A. 60-3701 treats tort victims seeking punitive damages differently than it treats tort victims who are not seeking punitive damages. This court found these two groups are not "arguably indistinguishable." 254 Kan. at 321. This court based its distinction on the fact

the law has always "treated the victims of particularly egregious conduct differently from other tort victims." 254 Kan. at 322. However, this rationale does not apply to health care provider insureds or their judgment creditors. This court has consistently treated health care provider insureds and the Fund similar to other insureds and insurers. See *Todd v. Kelly*, 251 Kan. at 525-26; *Harrison v. Long*, 241 Kan. at 180-82. Thus, health care provider insureds and their judgment creditors should be treated as "arguably indistinguishable" from other insureds and their judgment creditors.

If so, then K.S.A. 40-3412(c) implicates equal protection. It treats health care provider insureds and their judgment creditors differently from most other insureds or their judgment creditors who may bring bad faith claims against an insurer. This court has enunciated three different standards which may be used in determining if a statute violates equal protection—rational basis, heightened scrutiny, and strict scrutiny. *Farley v. Engelken*, 241 Kan. 663, 669, 740 P.2d 1058 (1987).

This court has traditionally treated malpractice legislation as economic regulation in which the rational basis test is applied. *Bair*, 248 Kan. at 831 (abrogation of vicarious liability between health care providers if they are both covered by the Act); *Leiker v. Gafford*, 245 Kan. 325, 363, 778 P.2d 823 (1989) (cap on nonpecuniary damages in wrongful death actions); *Stephens*, 230 Kan. at 130 (shortened statute of limitations in medical malpractice cases). Thus, the rational basis test is the appropriate standard to apply.

*Leiker*, 245 Kan. at 363-64, explains this "rational basis" test, also known as the "reasonable basis" test, as follows:

"The 'reasonable basis' test is violated only if the statutory classification rests on grounds wholly irrelevant to the achievement of the State's legitimate objective. The state legislature is presumed to have acted within its constitutional power, even if the statute results in some inequality. Under the reasonable basis test, a statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it."

Thus, under the rational basis test, if the Fund can show any facts which reasonably justify discrimination between health care provider insureds and all other insureds, then K.S.A. 40-3412(c) does

not violate the Equal Protection Clause. See *Leiker*, 245 Kan. at 364; *State ex rel. Schneider v. Liggett*, 223 Kan. 610, 620, 576 P.2d 221 (1978). The espoused purpose of the Act is to help health care providers procure available and affordable medical malpractice insurance. Such insurance will lure doctors to practice in Kansas so that the citizenry will have quality health care available. *Liggett*, 223 Kan. at 611.

The Fund requires all the health care providers in Kansas to purchase excess medical malpractice insurance from it. Should the Fund be liable for bad faith judgments, it may be forced to increase the surcharges which all health care providers in Kansas are required to pay. Thus, bad faith claims against the Fund would increase the cost of malpractice insurance for all Kansas health care providers. As a result, health care providers may choose to practice elsewhere, leaving Kansas citizens without available health care. Consequently, the Fund's immunity from bad faith claims is rationally related to the State's interest in keeping malpractice rates low so that health care providers will practice in Kansas. Moreover, the Fund's immunity from bad faith claims is rationally related to the State's interest in keeping the Fund economically viable so a medical malpractice victim is guaranteed to recover at least a part of his or her judgment against a negligent health care provider.

The plaintiffs claim that immunity from bad faith claims will not keep doctors in the state. Rather, if doctors are aware that the Fund could expose them to large personal liability, then doctors will leave the state rather than be forced to pay for insurance which does not really insure them. While the plaintiffs' argument may be factually and logically true, it is irrelevant. The State has supported its unequal treatment of arguably indistinguishable parties with some facts that demonstrate the unequal treatment is rationally related to a legitimate State interest. See *Leiker*, 245 Kan. at 363-64. It is not the court's place to second-guess the legislature.

Furthermore, the plaintiffs argue that "cutting costs" is not a legitimate State interest and thus the rational basis test has not been met. *Stephenson v. Sugar Creek Packing*, 250 Kan. 768, 780-81, 830 P.2d 41 (1992). If the State's interest behind K.S.A. 40-3412(c) were simply to cut the insurance costs of the Fund, then

certainly these would not be legitimate State interests. Yet, the purpose behind the legislature's desire to cut the costs of medical malpractice insurance is to lure health care providers to the state so that quality health care will be available to Kansas citizens and to insure that at least a reasonable amount of malpractice insurance is available to protect the vast majority of malpractice victims. These are legitimate State interests, and the abrogation of bad faith claims against the Fund is rationally related to these interests.

Finally, the plaintiffs rely heavily on *Flax v. Kansas Turnpike Authority*, 226 Kan. 1, 596 P.2d 446 (1979). In *Flax*, the plaintiff challenged K.S.A. 46-901 as a violation of equal protection. The statute granted immunity to the Kansas Turnpike Authority (KTA) for liability resulting from injuries which occurred as a result of highway defects. However, towns, cities, and counties which owned highways and roads were not granted such immunity. 226 Kan. at 6-7. While this fact situation is analogous to the one at issue, the justifications for the statutes are different.

In *Flax*, the State offered three interests to justify the statute. These interests included: (1) protecting the state treasury, (2) saving time and energy consumed in legal actions, and (3) protecting the KTA from high-risk activities. 226 Kan. at 10. The *Flax* court found these interests were not legitimate State interests, and thus unequal treatment based on these interests was a violation of equal protection. On the other hand, as explained above, the State's interests behind the Fund's immunity from bad faith claims are legitimate State interests. See *Stephens v. Snyder Clinic Ass'n*, 230 Kan. at 130. Thus, K.S.A. 40-3412(c) is rationally related to legitimate State interests, and it does not violate equal protection.

The answers to the certified questions are: (1) Kansas law does not recognize a claim of bad faith against the Health Care Stabilization Fund for a judgment in excess of the Fund's statutory limit of liability, and (2) as a result of the answer to question 1, whether a plaintiff holding the excess judgment may prosecute such a bad faith action against the Fund by way of garnishment in light of K.S.A. 60-723(d) is moot.

DAVIS, J., dissenting: I respectfully disagree with the majority's answer to the certified question of whether Kansas law recognizes

a claim of bad faith against the Health Care Stabilization Fund (Fund) when a judgment is returned that is in excess of the Fund's statutory limit of liability. I would answer the question in the affirmative.

In cases not governed by the Fund, an insured person whose insurance company had wrongfully failed to settle within the policy limits has a common-law cause of action against the company. See *Spencer v. Aetna Life & Casualty Ins. Co.*, 227 Kan. 914, 920, 611 P.2d 149 (1980). The rationale behind such a claim is that the insurer's assumption of the defense of the insured gives rise to a fiduciary relationship and a contractual duty to defend the insured in good faith. 227 Kan. at 920.

In cases where the Fund is implicated, the Fund assumes the defense of the insured in the same manner as a private insurance company. Thus, the Fund should be subject to the same duty to defend the insured in good faith.

The majority's finding that a common-law action for bad faith does not exist in these circumstances runs contrary to the intent of the Health Care Provider Insurance Availability Act. One of the purposes of the Act was to address the problems of obtaining and maintaining affordable malpractice insurance and maintaining the availability of medical services in Kansas. See *Blair v. Peck*, 248 Kan. 824, 827, 811 P.2d 1176 (1991). However, when the Fund wrongfully and in bad faith refuses to settle a claim within the policy limits, it exposes doctors, as it did to Dr. Shah in this case, to large excess judgments for which the doctors are personally liable.

The statutes cited by the majority, K.S.A. 40-3403(e) and K.S.A. 40-3412(c), do not compel the conclusion that the legislature intended to abrogate the liability of the Fund for a bad faith refusal to settle a claim. K.S.A. 40-3403(e) provides only that the Fund will not be liable to pay in excess of $3,000,000 pursuant to any judgment arising out of the rendering of or failure to render professional services. A bad faith claim for failure to settle within policy limits does not arise out of the rendering or failure to render professional services but is instead a claim arising from the fiduciary

duty owed by the Fund to its insured physician. Thus, K.S.A. 40-3403(e) cannot be construed as a limit on bad faith claims.

Similarly, the plain language of K.S.A. 40-3412(c) does not provide for the prohibition of a common-law bad faith claim. K.S.A. 40-3412(c) states that *"[n]othing herein* shall be construed to impose any liability in the fund in excess of that specifically provided for herein for negligent failure to settle a claim or for failure to settle a claim in good faith." (Emphasis added.) Rather than prohibiting a common-law claim for bad faith as the majority suggests, this statute merely provides that nothing in the Act would specifically create a statutory cause of action for bad faith.

I would find that in enacting K.S.A. 40-3403(e) and K.S.A. 40-3412(c), the legislature did not intend to eliminate the common-law claim for failure to settle in good faith. Accordingly, I dissent from the majority's opinion.